UNITED STATES of America, Plaintiff–Appellee,

v.

Curtis FOULKS, Jr., Defendant–Appellant.

No. 89–3643.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 25, 1990.

Decided June 8, 1990.

Catherine H. Killam (argued), Office of U.S. Atty., Toledo, Ohio, for plaintiff-appellee.

Alan Scott Fisher, Toledo, Ohio, E. Winther McCroom (argued), Breckenridge & McCroom, Youngstown, Ohio, for defendant-appellant.

Before MARTIN and BOGGS, Circuit Judges, and PECK, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

Curtis Foulks, Jr., appeals his conviction and sentence imposed for embezzlement

from the Toledo, Ohio Salvation Army's federally funded food and shelter program. We affirm.

Foulks was the Director of Community Services for the Toledo branch of the Salvation Army. Part of his duties included management of the emergency food and shelter program, including the procurement of food for distribution under the program. The emergency food program was administered by local service agencies, but was funded by the Federal Emergency Management Agency, which placed limits upon how the money could be spent, required certain record keeping and accounting procedures, and retained a reversionary interest in the funds. One of the limitations placed upon the local recipient agencies' use of the funds was that they could be spent only for "procurement costs." This limitation prohibited any employee or volunteer of a recipient agency from receiving any kind of benefit from the agencies' allotment.

After the Salvation Army received funds from the federal agency, those funds went into special accounts set up by the Salvation Army. Checks were then written against these accounts to buy food for the emergency program. Though the only person authorized by the Salvation Army to write checks was the Area Coordinator, the record shows that Foulks had virtually complete control over the purchasing of food for the emergency program.

On at least six separate occasions, Foulks directed that checks be drawn for the purchase of food for the emergency program. The first five checks charged in the indictment were made out to Yurika Foods. Unknown to anyone at the Salvation Army, Foulks was a Yurika Foods distributor, buying the food at wholesale prices and selling it back to the Salvation Army at a profit.

The first check, in the amount of $8,960.36, was deposited by Foulks in his personal checking account. He used $6,902.90 to buy food and kept the difference for himself. He deposited the second and third checks in an account he opened in the name "Yurika Foods, Curtis Foulks, Jr., Distributor," over which he had exclusive control. The movement of funds in and out of this account was tracked, revealing that the account balance was reduced to $23.30, with no evidence of a Yurika Foods purchase to satisfy the orders for which Foulks caused the two checks to be written.

The fourth check, in the amount of $10,118.70, and the fifth check, in the amount of $5,531.10, were also deposited into Foulks's Yurika account. He used $8,258.94 and $4,518.46, respectively, to buy food, and again kept the difference for himself.

Between the fifth and sixth checks, the Salvation Army bookkeeper notified the Area Coordinator that she had found someone who was able to sell Yurika products at a lower price. A memo was sent to Foulks directing him to purchase all Yurika products from this other person in the future.

Ignoring the memo, Foulks had the sixth check made out to Ted's Quick Cuisine in the amount of $5,508.80. Ted's was Foulks's wholesaler of Yurika products. Foulks presented this check to Ted's for an order of $4,395.73, explaining that there had been a bookkeeper's error. At Foulks's direction, Ted's wrote Foulks a check for the difference.

Foulks was indicted by a grand jury on six counts of embezzlement of federal funds in violation of 18 U.S.C. § 641. After a bench trial, he was convicted on all counts. He was sentenced to a term of five years imprisonment. Imposition of sentence was suspended on the condition that Foulks serve six months in a jail-type institution and the remaining four and one-half years on probation. In addition, Foulks was ordered to pay restitution in the amount of $17,680.63.

■ On appeal, Foulks argues that the funds at issue were not federal funds within the meaning of 18 U.S.C. § 641, and thus he cannot be guilty of violating that statute. Foulks relies on *United States v. Gavin*, 535 F.Supp. 1345 (W.D.Ohio 1982), *aff'd*, 718 F.2d 1101 (6th Cir.1983), and

*United States v. Morris*, 541 F.2d 153 (6th Cir.1976), contending that the funds had lost their federal character. We disagree.

*Gavin* also involved a prosecution for conversion of federal funds brought under 18 U.S.C. § 641. A check from the Small Business Administration in favor of a borrower named Tech–Fab was delivered to Tech–Fab and properly endorsed. The money was to be used to buy real property from the City of Benton Harbor. The funds were deposited in an account of a local development corporation, which was to hold the money until a deed was delivered to Tech–Fab from the City. Before the money was paid over to the City, Gavin, an officer of the development corporation and an attorney for the City, took $17,000 for his personal use.

The court held that the money was not federal at the time of Gavin's theft. The money had been delivered to the intended beneficiary, Tech–Fab, and the government had no control over expenditures by Tech–Fab.

*Morris* involved a stolen check drawn by a private corporation which did not receive federal funds and made payable to a county agency that did receive federal funds. The check was taken prior to its delivery to the county agency. The court held that the check was not property of the United States because the agency had never received the check and it was thus property of the corporation.

Both *Gavin* and *Morris* turn on the principle that a check belongs to the payee upon delivery. In both cases, the theft occurred when the check was the property of a party not subject to the control or reversionary interest of the United States. Foulks, conversely, took the checks directly from the special accounts of the Salvation Army which were wholly funded by an agency of the United States, the Federal Emergency Management Agency.

The evidence clearly shows that the funds, though in the accounts of the Salvation Army, retained their federal character. The Federal Emergency Management Agency limited or controlled the use of these funds in that the Salvation Army was required to report back to the federal agency, and any unused funds or misused funds were to be returned to the federal agency. Where the government retains power over grant funds, those funds retain their federal character even though deposited into accounts of non-federal agencies. *Hayle v. United States*, 815 F.2d 879 (2d Cir.1987); *United States v. Wheadon*, 794 F.2d 1277 (7th Cir.1986). We find, therefore, that Foulks did, in fact, convert federal funds within the meaning of 18 U.S.C. § 641.

■ Foulks's other argument challenges the sufficiency of the evidence. He contends that the government failed to prove he possessed the requisite intent, claiming that he thought he was entitled to profit from the food purchases and that his distributorship had "an open arms length relationship" with the Salvation Army. In addition, he contends that the government failed to prove a sufficient loss to support the amount ordered as restitution, claiming that the proof was inadequate on the question of whether any food was bought with the second and third checks.

We review challenges to the sufficiency of evidence by determining whether there is "substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Martin*, 704 F.2d 267 (6th Cir.1983), *citing Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1972). Given this standard, it is clear that there is sufficient evidence that Foulks possessed the requisite intent for embezzlement under 18 U.S.C. § 641. No one in the Salvation Army knew of Foulks's secret profits. When specifically asked how Yurika works, Foulks said that the local distributor was someone other than himself. When directed to buy Yurika products from a different distributor, Foulks continued to sell the products himself, while attempting to hide that fact. Additionally, no checks were ever made payable in any way to indicate the participation of Foulks in the sales, although all the checks except the one to Ted's were deposited into accounts that carried his name. All of these facts certainly indicate a pattern of deception on

Foulks's part and support a finding of the requisite intent for the crime of embezzlement under 18 U.S.C. § 641.

Sufficient evidence also supports the order of restitution. Foulks was ordered to pay $17,680.63 to the Federal Emergency Management Agency as restitution. This figure equals the difference between the total amount of money Foulks obtained from the Salvation Army and the total amount he actually paid for the purchase of food. There is sufficient evidence to support a finding that no food was ever purchased by Foulks with the funds he obtained from the second and third checks.

Accordingly, we affirm the judgment of the district court.