**UNITED STATES of America, Plaintiff**

v.

**Kathy KLINGLER, Defendant.**

**Crim. A. No. 92–CR–809370–DT–1.**

United States District Court,
E.D. Michigan, S.D.

July 19, 1993.

Stephen L. Hiyama, Asst. U.S. Atty., Detroit, MI, for plaintiff.

Martin S. Baum, Detroit, MI, for defendant.

## ORDER

JULIAN ABELE COOK, Jr., District Judge.

On October 14, 1992, the Defendant, Kathy Klingler, was indicted for one count of theft, conversion, or embezzlement of Government

monies in violation of 18 U.S.C. § 641,[1] and for one count of failing to timely deposit Government monies in violation of 18 U.S.C. § 649.[2] The United States of America (Government) alleges that in a series of transactions from September 1991 to February or March 1992 Klingler, in her capacity as a licensed customs broker, failed to deposit and converted to her own use monies owed to it as customs duties. (Indictment at 1–2.) On April 14, 1993, she filed the instant Motion to Dismiss the Indictment which is now pending before this Court.

## I.

Title 19 of the Code of Federal Regulations is comprised of regulations that govern customs duties. Chapter 1, United States Customs Service, Department of the Treasury, is composed in part of regulations which govern the payment of customs duties by importers. Entry of Merchandise, 19 C.F.R. § 141 (1992). The regulations that pertain to an importer's responsibilities to the Customs Service provide the option of paying the duties owed to the Government directly or through a licensed customhouse broker. Liability of Importer for Duties, 19 C.F.R. § 141.1(b)(3) (1992). If the importer chooses to employ a customs broker, it may either remit two checks to the broker, one for the broker's services and the other for the monies owed to the Government, or it may make both payments in one check payable to the broker. *Id.* at § 141.-1(b)(3)(ii)(A)–(B) (1992). If the latter option is chosen, the broker is responsible for separating the funds and remitting the duties to the Government. *Id.* at § 141.1(b)(3)(ii)(A). However, the importer remains liable to make payment to the Government, even if a customs broker has been employed but has failed to remit payment to the Government. *Id.* at § 141.1(b)(1) (1992).

Title 19 of the Code of Federal Regulations also contains regulations which govern the licensing, responsibilities, and monitoring of customs brokers. Customs Brokers, 19 C.F.R. § 111 (1992). Customs brokers are subject to those regulations which delineate (1) the records that they are to maintain and file with the Customs Service,[3] and (2) their responsibility to remit payment to (a) the Government[4] and (b) their clients.[5] The

---

**1.** 18 U.S.C. § 641 reads, in relevant part:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another ... any record, voucher, *money,* or *thing of value of the United States* or of any department or agency thereof ... or
>
> Whoever receives, conceals or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined, or converted—
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1000 or imprisoned not more than one year, or both....
>
> *Id.* (emphasis added).

**2.** 18 U.S.C. § 649 reads, in relevant part:

> Whoever having *money of the United States* in his possession or under his control, fails to deposit it with the Treasurer or some public depository of the United States, when required so to do by the Secretary of the Treasury or the head of any other proper department or agency or by the General Accounting Office, is guilty of embezzlement, and shall be fined in a sum equal to the amount of money embezzled or imprisoned not more than ten years, or both; but if the amount embezzled is $100 or less, he shall be fined not more than $1000 or imprisoned not more than one year, or both.

*Id.* (emphasis added).

**3.** 19 C.F.R. §§ 111.21–111.30 (1992) discuss the record keeping procedures which customs brokers must follow. Not only must specific information be provided pursuant to these regulations, but a standard format for recording financial transactions is prescribed in 19 C.F.R. § 111.22(d). The regulations also require that the customs broker make the records available to the Customs Service for examination. Records shall be available, 19 C.F.R. § 111.25.

**4.** 19 C.F.R. § 111.29(a) (1992) prescribes, in pertinent part, that

> [e]ach broker shall exercise due diligence in making financial settlements, in answering correspondence, and in preparing or assisting in the preparation and filing of records relating to any customs business matter handled by him as a broker. Payment of duty, tax, or other debt or obligation owing to the Government for which the broker is responsible, or for which the broker has received payment from a client, shall be made to the Government on or before the date that payment is due. Payments received by a broker from a client after the due date shall be transmitted to the Government within 5 working days from receipt by the broker....

**5.** 19 C.F.R. § 111.29(a) reads, in relevant part: [e]ach broker shall provide a written statement to a client accounting for funds received for

regulations also provide for the revocation and suspension of a customs broker's license. 19 C.F.R. §§ 111.50–111.81 (1992).[6]

In this case, Klingler was a licensed customs broker whose professional activities were governed by these regulations. She owned and operated a Michigan corporation, International Customs Corporation (ICC), which was also licensed as a customs broker. The Government alleges that from September 1991 through February or March of 1992, she performed the paper work in fifty-seven transactions for the importation of goods through the port of Detroit but failed to remit the estimated customs duties owed to the Government. (*See* Indictment at 1–2; Government's Brief in Support of Response to Motion to Dismiss the Indictment at 9–10.) It is alleged by the Government that in each of these transactions, Klingler, through the ICC, (1) sent an invoice to the client in which she delineated the duties owed to the Government and the fees owed to the ICC, (2) received a single check in payment from the client, and (3) failed to pay the duties owed on the transaction to the Customs Service. (Government's Brief at 9–10.) It is further alleged that Klingler deposited the funds in the corporate account of the ICC and transferred portions thereof to her personal account. *Id.* at 10–11. The amount allegedly embezzled or converted is $159,985.01. *Id.* at 11.

## II.

In her Motion to Dismiss the Indictment, Klingler contends that the money at issue was not Government money or property within the meaning of the statutes under which she has been charged. (Klingler's Motion to Dismiss the Indictment at 6.) The

crux of her argument is that the money was never the property of the Government but rather it was the property of her clients. She supports this argument on several grounds: (1) similar cases involving violations of 18 U.S.C. §§ 641, 649 have grounded determinations of whether the Government possessed a property interest on the source of the funding or "thing of value" allegedly stolen or embezzled, (Klingler's Brief in Support of Motion to Dismiss the Indictment at 6), (2) the Government only has a security interest in the allegedly stolen funds, and such an interest is not sufficient to make the statutes applicable, *Id.*, (3) the regulations which govern the duties of importers and customs brokers support her argument, *Id.* at 12–13, and (4) because her relationship to the Government was one of a debtor to a creditor, rather than one of a bailee to a bailor, no conversion of Government funds could have occurred, (Klingler's Motion to Dismiss at 5.) She contends that no federal jurisdiction over this case exists, and requests the dismissal of the Indictment.

The Government raises two arguments in response: (1) this Motion is untimely because it was not brought within twenty days following Klingler's arraignment as prescribed by the Standing Order for Discovery and Inspection and Fixing Motion Cutoff Date in Criminal Cases (Government's Brief at 2), and (2) the detailed regulation of customs brokers and the payment of customs duties by importers, which evidences the high degree of Government interest in the money at issue, demonstrates that the money was Government property within the meaning of the statutes and there is federal jurisdiction over this matter. *Id.* at 5–6.

the client from the Government, or received from a client in excess of the Governmental or other charges properly payable as part of the client's customs business, within 60 days of receipt. No written statement is required if there is actual payment by a broker of such funds.

**6.** The regulations set forth several grounds upon which a suspension or revocation of a license

may be based, including conviction of a felony or misdemeanor relating to or arising from the conducting of customs business, theft, larceny, embezzlement, or fraudulent conversions, and violation of laws enforced by Customs. Grounds for suspension or revocation of license or permit or monetary penalty in lieu thereof, 19 C.F.R. § 111.53 (1992).

### III.

According to E.D.Mich. LR 247.1(b),[7] pretrial motions in criminal matters must be filed by the date specified by the Court in the Standing Order for Discovery and Inspection and Fixing Motion. On November 3, 1992, this Court fixed November 12, 1992, which was twenty days after the arraignment, as the date by which motions must be filed. (Trial Notice, Notice of Plea Cutoff Date, November 3, 1992.) Because this Motion was filed on April 14, 1993, Klingler's request was untimely.

However, under Paragraph 12 of an existing Administrative Order, "[t]he judge to whom a case is assigned may amend, modify, or set aside, in whole or in part, any of the provisions of this order on motion of either party or *sua sponte* with prior notice given to the parties." (Administrative Order, No. 90–AO–010, February 12, 1990.) During a hearing on April 2, 1993, this Court directed Klingler to submit any motions by April 16, 1993. (Criminal Minutes, April 2, 1993.) Although this oral ruling was not entered in the record as a written order of this Court, the merits of the matter at hand are of such importance that the modification of the Standing Order is warranted. Inasmuch as good cause exists for consideration of Klingler's untimely filing, and both parties received notice of the amended filing date at the hearing, this Court will now turn to the substance of the instant Motion.

Federal jurisdiction over violations of 18 U.S.C. § 641 derives from federal ownership of the property at issue. *See U.S. v. Jermendy,* 544 F.2d 640, 641 (2d Cir.1976), *cert. denied,* 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977). "It is now well established that the statutory requirement that the stolen property belonging to the government … furnishes the basis for federal jurisdiction…." *U.S. v. Baker,* 693 F.2d 183, 186 (D.C.Cir.1982). This Court has not uncovered any case law which would indicate that federal jurisdiction under 18 U.S.C. § 649 is not triggered in the same way. Klingler has asserted that her arguments regarding Count 2 of the Indictment, which

relate to a violation of § 641, also apply to Count 1 which charges her with violating § 649. (Klingler's Brief at 18–19). Therefore, this Court will evaluate both Counts of the Indictment together in its analysis of the instant Motion.

Klingler contends that "[c]hallenges made to convictions under 18 U.S.C. § 641 … on the basis that the United States did not have a sufficient federal interest in the item in question to make it a thing of value '*of the United States*' all turn on the *source* of the funds or thing of value stolen, embezzled, or converted." (Klingler's Brief at 6–12 (citing *U.S. v. Gibbs,* 704 F.2d 464 (9th Cir. 1983); *U.S. v. Bauer,* 713 F.2d 71 (4th Cir. 1983); *U.S. v. Forcellati,* 610 F.2d 25 (1st Cir.1979); *U.S. v. Maxwell,* 588 F.2d 568 (7th Cir.1978); *U.S. v. Edwards,* 473 F.Supp. 81 (D.C.Mass.1979).)) According to Klingler, the common thread among these cases is that the Government's ownership of or interest in the items at issue was dependent upon the Government's status as the source of the allegedly embezzled or stolen funds or items. *Id.*

Klingler's interpretation of the case law is erroneous. Although the cases have often involved items or funds that are issued from the Government, that common element does not define ownership. Rather, the key factor to be evaluated in making a determination of whether the Government has a sufficient interest in certain funds or items is the degree of its control over and interest in the "thing of value" at issue. *U.S. v. Foulks,* 905 F.2d 928 (6th Cir.1990); *U.S. v. Benefield,* 721 F.2d 128 (4th Cir.1983).

In *Foulks,* the defendant, in his capacity as the Director of Community Services for the Toledo District of the Salvation Army, was responsible for managing the emergency food and shelter program. The Federal Emergency Management Agency funded this program, "placed limits upon how the money could be spent, required certain record keeping and accounting procedures, and retained a reversionary interest in the funds." 905 F.2d at 929. Foulks managed the food purchasing for the program, and his activities in

---

**7.** E.D.Mich. LR 247.1(b) reads, "Pretrial motions shall be filed within the time specified in the standing order of discovery and inspection and fixing motion cut-off date in criminal cases unless modified by order of the District Judge."

that capacity formed the basis for the allegations that he violated a regulation which prohibited employees from benefitting from the agency's allotment. *Id.* Foulks secretly purchased food for the program from a distributorship that he owned, and, through this clandestine effort, made a profit on these sales to the Salvation Army. *Id.* Rejecting Foulks' claim that the funds at issue were not federal funds, the Sixth Circuit Court of Appeals (Sixth Circuit) held that,

> [t]he evidence clearly shows that the funds, though in the accounts of the Salvation Army, *retained their federal character.* The Federal Emergency Management Agency limited or controlled the use of these funds in that the Salvation Army was required to report back to the federal agency, and any unused or misused funds were to be returned to the federal agency.

*Id.* at 930 (emphasis added).

Similar language regarding control was used in *Benefield,* 721 F.2d 128, which involved funds in transit to the federal Government.[8] Benefield was accused of embezzling Government property when, in her capacity as a cashier for the Government-owned Non-Commissioned Officers Club, she inserted her own name as payee on the blank checks that were intended for the Government. *Id.* at 128–29. The checks were supposed to have been deposited in the Government's account and subsequently distributed as gratuities in the payroll checks of the employees who had worked the event for which the money was paid. *Id.* at 129. Although the Department of Army regulations under which the Club operated did not prescribe this procedure for tip distribution, Benefield knew that the Club had developed this standard operating procedure. *Id.* The Fourth Circuit Court of Appeals (Fourth Circuit) held that the tip money was Government property, explaining that "[i]n determining whether an interest qualifies as 'any ... money, or thing of value of the United States,' under 18 U.S.C. § 641, courts have identified as critical factors the basic philosophy of ownership reflected in relevant stat-

utes and regulations and the supervision and control contemplated and manifested by the government." *Id.* (citations omitted).

■ Applying these holdings to the instant case demonstrates that the money at issue was "a thing of value of the United States." Although these funds were not federal grant monies as in *Foulks,* 905 F.2d 928, they were of a federal character and the federal Government exercised control over these funds through the regulations regarding the licensing of customs brokers and the regulations governing the payment of import duties. These regulations establish detailed procedures for the payment of these duties and record keeping by the importers and the customs brokers. 19 C.F.R. §§ 111.21–.29, 141.1–.30, 141.61–.105, 142. As with all customs brokers, Klingler's handling of these funds was to comport with the procedures that had been prescribed and regulated by the Government.

The fact that the funds originated from a source other than the Government is not determinative of the issue of Government property or interest. *Benefield* presents a strong analogy to the case at hand. In that case, the defendant knew that the funds at issue were designated for the Government, yet she inserted her name as the designated payee. 721 F.2d at 128–29. In the instant case, the Government alleges that Klingler knew that (1) a portion of each check that had been sent to her by her clients was designated for the Government and (2) despite this knowledge, she failed to remit those funds to the Government. (*See* Indictment at 1–2; Government's Brief at 10, 15.) The invoices that were sent by the ICC to its clients separated the amounts owed to the Customs Service and the amounts owed to the ICC for its services. (Government's Brief at 8, Ex. 3.) Furthermore, Klingler was presumptively aware of her responsibilities and duties as a licensed customs broker, having been licensed in Chicago in February of 1980 and in Michigan as an individual in

---

**8.** *Benefield* demonstrates the error of Klingler's assertion that there have been no cases involving funds which did not originate with the Government, but which were enroute thereto. *See also*

*U.S. v. Jackson,* 759 F.2d 342 (4th Cir.1985), *cert. denied,* 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265.

June of 1983 and upon the incorporation of the ICC in April of 1989. The Government submits that Klingler knew that the funds at issue were Government property, and the fact that they originated from a third party had no effect upon their status as such.

■ This case presents unusual circumstances in that the funds at issue were included as portions of various checks made payable not to the Government, but to Klingler as a customs broker. There is some question as to whether such funds can be considered "money" under the relevant statutes. Two circuit courts of appeal are divided as to the treatment of checks made payable to the Government, and whether such checks constitute "money of the United States" within the meaning of 18 U.S.C. § 649. *U.S. v. Jackson*, 759 F.2d 342 (4th Cir.1985), *cert. denied*, 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265 (1985); *U.S. v. Fernando*, 745 F.2d 1328 (10th Cir.1984).[9]

In *Fernando*, the Tenth Circuit Court of Appeals (Tenth Circuit) held that the term "money," as it was used in 18 U.S.C. § 649(a), applied only to cash and currency and not to checks. 745 F.2d 1328. In his capacity as an employee of the Bureau of Indian Affairs, Fernando received checks that had been made payable to the United States. However, he failed to deposit some of the checks which collectively amounted to approximately $786,865.66. *Id.* at 1329. Affirming the dismissal of his Indictment, the Tenth Circuit explained that "[t]he words of § 649 do not plainly impose liability for failing to deposit negotiable documents." *Id.* Finding no legislative history to shed light on the meaning of the word "money" in the statute, the Tenth Circuit based its decision upon the fact that (1) the term "money" had been in the statute prior to the common usage of checks but had not been amended while other portions of the statute had been modified, (2) the state courts had interpreted "money" as not including checks, (3) Congress could have believed that more harm would come from the failure to deposit cur-

rency than from the failure to deposit checks, and (4) "the existence of other criminal statutes, such as 18 U.S.C. § 641, which has a scope clearly broad enough to make criminal any conversion to personal use of checks as well as money ... [is persuasive evidence] that a broad reading of the term 'money' [in § 649] is not imperative." *Id.* at 1330.

In *Jackson*, 759 F.2d 342, the Fourth Circuit departed from the Tenth Circuit's reading in *Fernando* and held that checks made payable to the United States were "money of the United States" within the meaning of 18 U.S.C. § 649. Jackson, a collection officer for the United States Forestry Service, was responsible for collecting money paid to the Forestry Service for timber, maps, and recreational permits. *Id.* at 343. She was charged with failing to deposit these funds on several occasions from October 1981 through October 1982. *Id.* Jackson claimed that checks made payable to the United States do not constitute "money of the United States" as is contemplated in 18 U.S.C. § 649(a). *Id.*

The Fourth Circuit explained that "[a]nalyzing the statute by viewing its text, its legislative history, prior interpretations, related statutes, and the underlying congressional purpose and public policy considerations, however, leads us to the conclusion that 'money' as used in section 649(a) includes checks payable to the United States." *Id.* at 344 (footnote omitted). The Fourth Circuit found its analysis of related statutes and the underlying congressional intent to be the most persuasive indications of the meaning of the statute. *Id.* at 344–45. The Fourth Circuit held that the Tenth Circuit's comparison of the statutes was unpersuasive, explaining that

[t]he statutes compared in *Fernando* ... were not enacted pursuant to any integrated legislative plan. They were, for the most part, based upon a variety of predecessor statutes, and there is no reason to suppose Congress intended them to comprise a consistent scheme for protecting

---

9. Despite the split in the circuits over the scope of 18 U.S.C. § 649, there is a consensus among the circuits that checks made payable to the Government fall within the purview of 18 U.S.C.

§ 641. *U.S. v. Jackson*, 759 F.2d 342 (4th Cir. 1985), *cert. denied*, 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265 (1985); *U.S. v. Fernando*, 745 F.2d 1328 (10th Cir.1984).

the assets and revenues of the United States.

*Id.* Turning to the legislative purpose of the statute, the Fourth Circuit explained that, "[t]o hold that section 649 proscribes the failure to deposit only cash would drastically narrow the protection of the public funds provided by the statute and thereby 'do violence to the purpose of Congress.'" *Id.* at 345 (citation omitted).

This Court will adhere to the Fourth Circuit's interpretation of 18 U.S.C. § 649. This reading offers more protection to the Government's funds than does the Tenth Circuit's narrower reading which could be used to insulate more strategic conversions of Government money from prosecution. Because the Fourth Circuit's reading of 18 U.S.C. § 649 more fully preserves the legislative intent behind the statute by making it applicable to more forms of Government property, this Court will view 18 U.S.C. § 649 as including checks in its conception of "money." *Jackson,* 759 F.2d 342.

Although in the instant case there were no checks made directly payable to the Government, *Jackson* is instructive because portions of the checks which Klingler received from her clients were clearly intended for the Government. This set of circumstances is similar to those in which a check is made out directly to the Government. The Government did not lose its interest in the money owed to it as customs duties simply because the checks of which the duties were part were not made payable to the Government. If this were the case, the Government would never have allowed the duties to be paid in this manner. Because 19 C.F.R. § 141.-1(b)(3)(ii)(A) provides for payment of customs duties and broker fees by the client in one check payable to the customs broker, the Government clearly intended to retain its claim on and interest in the duties owed to it at all times. This situation is similar to that in which a check is actually made payable to the Government directly. Therefore, the funds at issue in this case constitute "money of the United States" within the meaning of 18 U.S.C. § 649 as well as "a thing of value of the United States" under 18 U.S.C. § 641.

■ Klingler's other arguments are equally unpersuasive. First, relying upon *United States v. Owen,* 536 F.2d 340 (10th Cir.1976), and *U.S. v. Tana,* 618 F.Supp. 1393 (S.D.N.Y. 1985), she contends that (1) the Government possesses only a security interest in the funds which were allegedly embezzled by her, and (2) any theft or embezzlement thereof is not actionable under 18 U.S.C. § 641. (Klingler's Brief at 6.) However, the case law does not simply hold, as Klingler suggests, that a security interest is not sufficient to trigger jurisdiction. In *Tana,* the court reviewed the factors which had been generally used to determine the amount of control retained by the Government over the property at issue and found that the type of interest was only one factor among several to be considered:

> "[the courts have gauged] a number of factors including (1) [the existence of a] specific reversionary interest in the federal government, (2) the statutory requirement that funds be used for the purposes intended, and (3) whether the recipient is required by federal law to maintain financial records, file reports, adopt government methods of management, or submit to federal oversight."

618 F.Supp. at 1395 (alterations in original) (citing *U.S. v. Barreda,* 607 F.Supp. 419, 420 (N.D.Ind.1985)). There is no evidence which indicates that the Government's interest in the funds allegedly embezzled by Klingler was a mere security interest. Even if such evidence did exist, this factor alone would not render it an insufficient interest under the statute because of the existence of other indicia of control.

Next, Klingler cites several sections of Customs Duties, 19 C.F.R. which pertain to customs brokers and the liabilities of importers as grounds for her motion. (Klingler's Brief at 12–15.) She relies on the fact that (1) under 19 C.F.R. § 141.1(b), the Government "did not bear the risk of loss for the estimated duties" because the importers are liable to the Government for the duties owed despite the fact that the importers had sent a check to the broker, (2) a customs broker is not required by law or regulation to separate the funds received from its clients into a

special account designated for the payment of customs duties, and (3) under the federal regulations, the customs broker is an agent of the importer, not of the Government. *Id.*

■ Although Klingler correctly restates the relevant regulations, her reliance upon them as grounds for dismissal of the Indictment is misplaced for several reasons. First, despite the imposition of ultimate liability for customs duties upon the importer, 19 C.F.R. § 141.1(b), Klingler remains obligated under the regulations to remit the payments received from her clients to the Government. 19 C.F.R. § 1129(a).

Second, although customs brokers are not obligated to separate the funds that are received from their clients, they are obligated to remit those funds to the Government. 19 C.F.R. § 111.29(a) mandates that "[p]ayment of duty, tax, or other debt or obligation owing to the Government for which the broker is responsible, or for which the broker has received payment from a client, shall be made to the Government on or before the date that payment is due. . . ." Thus, it is immaterial that the specific procedure for fulfilling this duty was not prescribed by the Government. The issue is whether Klingler failed to perform the duty at all.

■ Third, the nature of the relationship between a customs broker and an importer is not determinative of the duties owed by a customs broker to the Government. Rather, these duties are specified in Customs Brokers, 19 C.F.R. § 111. A customs broker is subject to the licensing standards that have been established by federal regulations. In order to maintain the license, a broker must adhere to the rules therein. As a licensed customs broker, Klingler had responsibilities to the Government, and her compliance with the regulations and fulfillment of these duties is not defined by or subordinate to the nature of her relationship with her client.

■ Finally, Klingler claims that she enjoyed a debtor-creditor relationship with the Government. (Klingler's Brief at 15.) It is her position that she did not convert funds from the Government because a conversion of funds cannot occur in a debtor-creditor relationship. *Id.* (citing *U.S. v. Johnston,*

268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925); *U.S. v. Lawson,* 925 F.2d 1207 (9th Cir.1991); *United States v. Kristofic,* 847 F.2d 1295 (7th Cir.1988)).

However, this case is distinguishable from those cited by Klingler in support of this argument. For instance, in *Lawson,* 925 F.2d 1207, an auctioneer who had conducted auctions for the Government was accused of converting the auction proceeds to which the Government was entitled. The court explained that "[w]hen a party is allowed to commingle funds and merely is required to pay the amount of net auction proceeds to the seller, his status is more properly seen as a debtor rather than a bailee." 925 F.2d at 1210 (citing *In re Walker Industrial Auctioneers, Inc.,* 38 B.R. 8 (Bkrtcy.D.Or.1983) (footnote omitted)). Klingler relies on this definition, yet fails to discern the reasoning underlying it. The *Lawson* court relied, in part, on *U.S. v. Kristofic,* 847 F.2d 1295 (7th Cir.1988), to support its argument that no conversion can occur in a debtor-creditor relationship. *Id.* at 1209. The principle of *Kristofic,* however, rests on the notion that it was because the funds had ceased to be the property of the Government that no conversion could occur in the relationship at issue. The *Kristofic* court explained that "[i]t is thus axiomatic that conversion must involve the property of *another,* not the property of the defendant." 847 F.2d at 1297 (citations omitted).

Unlike the defendants in *Johnston* and *Lawson* who were required to remit portions of the money which they had earned to the Government, the funds that Klingler was obligated to remit to the Government did not represent a portion of her own earnings. She was not required to remit these funds to the Government as taxes on her proceeds from her customs business. Rather, the funds which Klingler allegedly embezzled were entrusted to her by her clients for delivery to the Government. Therefore, the money that she was required to transfer to the Government represented monies owed to the Government by third parties.

The mere fact that she may have commingled the duties and the fees from her clients does not transform her relationship with the

Government into one of a debtor to a creditor because a more significant element of the relationship is that these funds were never owned by Klingler. Although the money was temporarily in her possession, Klingler never owned the funds. The portions of the checks, which represented the estimated customs duties, were not paid to Klingler as fees. The funds were monies intended by the clients to be paid to the Government. Therefore, while the defendants in *Johnston* and *Lawson* could not be found guilty of conversion because property that they owned was involved, it is possible for Klingler to be found guilty of embezzling or converting the funds at issue in this case because she did not own them.

### IV.

The funds which Klingler is alleged to have embezzled and converted were "things of value of the United States," 18 U.S.C. § 641 and "money of the United States," 18 U.S.C. § 649. Therefore, there is federal jurisdiction over this matter. Accordingly, this Motion to Dismiss the Indictment must be denied.

IT IS SO ORDERED.