**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kathy KLINGLER, Defendant–Appellant.**

No. 94–1211.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 15, 1994.

Decided July 19, 1995.

David Debold (argued), Stephen L. Hiyama, Asst. U.S. Atty. (briefed), Office of the U.S. Atty., Detroit, MI, for plaintiff-appellee.

Jill Leslie Price (argued and briefed), Federal Public Defenders Office, Detroit, MI, for defendant-appellant.

Before: MARTIN and BOGGS, Circuit Judges; and BELL, District Judge.*

BOGGS, Circuit Judge.

Kathy Klingler appeals her conviction for converting money of the United States pursuant to a conditional guilty plea, claiming that the district court erred in denying her motion to dismiss the indictment. We reverse the district court's decision because the misappropriated funds never became "money of the United States" or a "thing of value of the United States," as required by 18 U.S.C. § 641 and 649.

I

Kathy Klingler was a customs broker, licensed by the United States Customs Service to facilitate the entry of goods into this country. The Customs Service detains goods when they arrive at domestic ports, and an "entry summary" must be filed, describing the items being imported and estimating the taxes and duties owed. The importer must pay these customs duties, fees, and taxes

---

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michi-   gan, sitting by designation.

before the goods can be released. Although she filed the proper entry documents for her clients, Klingler failed to remit $159,985.01 in estimated customs fees and duties for fifty-seven transactions, and instead used these funds, received from her clients, for personal expenses. Klingler's clients remained liable for the duties, and they have paid the Customs Service in full. Several civil actions against Klingler are currently pending.

Klingler was indicted under 18 U.S.C. § 641 [1] for theft, conversion, or embezzlement of "money, or thing of value of the United States," and under 18 U.S.C. § 649 [2] for failing to make a timely deposit of "money of the United States." Klingler pled guilty to the conversion charge under a conditional plea agreement that allowed her to appeal the district court's denial of her motion to dismiss the indictment; the failure to deposit government monies charge was dropped pursuant to the agreement. She was granted bond, and her sentence of fifteen months in prison and restitution of $159,985.01 was stayed pending the resolution of this appeal.

The district court denied Klingler's motion to dismiss for a lack of federal jurisdiction. *United States v. Klingler*, 827 F.Supp. 1287 (E.D.Mich.1993). As the district court correctly noted, "[i]t is now well established that the statutory requirement that the stolen property belong[ ] to the government ... furnishes the basis for federal jurisdiction...." *Id.* at 1291 (*quoting United States v. Baker*, 693 F.2d 183, 186 (D.C.Cir.1982)). Klingler argued that the funds belonged to her clients, not the United States, thus divesting the court of jurisdiction. The district court disagreed, holding that the degree of federal interest in and control over the funds were the critical factors in applying the statutes. *Ibid.* Because the federal government extensively regulates the licensing of brokers and the payment of import duties, the court concluded that the estimated duties were "money of the United States." *Id.* at 1292.

The district court also rejected Klingler's contention that the determining factor in cases under 18 U.S.C. § 641 and 649 is the government's status as the source of the stolen property. Instead, the court declared "the key factor to be evaluated in making a determination of whether the Government has a sufficient interest in certain funds or items is the degree of its control over and interest in the 'thing of value' at issue." *Id.* at 1291. To support its interpretation, the court noted that "[a]lthough these funds were not federal grant monies ... they were of a federal character and the federal Government exercised control over these funds through the regulations regarding the licensing of customs brokers and the regulations governing the payment of import duties." *Id.* at 1292.

Instead, the district court agreed with the Fourth Circuit's conclusion in *United States v. Jackson*, 759 F.2d 342 (4th Cir.), *cert. denied*, 474 U.S. 924, 106 S.Ct. 259, 88 L.Ed.2d 265 (1985), that checks payable to the United States constitute "money of the United States" because such an interpretation "offers more protection to the Government's funds than does the Tenth Circuit's narrower reading which could be used to insulate more strategic conversion of Government money from prosecution ... [and] more fully preserves the legislative intent of

---

1. **§ 641. Public money, property or records**

    Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another ... any record, voucher, money, or thing of value of the United States or of any department or agency thereof ...

    Shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

2. **§ 649. Custodians failing to deposit moneys; persons affected**

    (a) Whoever, having money of the United States in his possession or under his control, fails to deposit it with the Treasurer or some public depositary of the United States, when required to do so by the Secretary of the Treasury or the head of any other proper department or agency or by the General Accounting Office, is guilty of embezzlement, and shall be fined in a sum equal to the amount of money embezzled or imprisoned not more than ten years, or both ....

    (b) This section ... shall apply to all persons charged with the safekeeping, transfer, or disbursement of the public money, whether such persons be charged as receivers or depositaries of the same.

the statute by making it applicable to more forms of Government property...." *Klingler*, 827 F.Supp. at 1294 (rejecting the holding in *United States v. Fernando*, 745 F.2d 1328 (10th Cir.1984), that § 649 applies only to cash and currency, not checks).[3] Finally, the court was unswayed by Klingler's assertions that she had only a debtor-creditor relationship with the Government or that the government held only a security interest rather than a property interest in the purloined funds. *Id.* at 1294–96.

Klingler contends that the district court lacked jurisdiction because the funds belonged to her clients, not the United States. She notes that customs regulations make the importer, not the broker, solely responsible to the government for all duties. Customs regulations also specify that brokers are agents of the importer, not of the United States. Klingler argues that she had, at most, a debtor/creditor relationship with the government.

## II

Since the facts are undisputed, this case presents a pure question of law concerning the interpretation of 18 U.S.C. § 641 and § 649. A district court's conclusions of law are subject to *de novo* review on appeal. *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 274, 130 L.Ed.2d 191 (1994); *Whitney v. Brown*, 882 F.2d 1068, 1071 (6th Cir.1989).

In interpreting a statute, the first step is always to look at its language. Penal statutes are to be construed narrowly, and a penalty should be imposed only where the language of the statute plainly mandates it.

*United States v. Campos–Serrano*, 404 U.S. 293, 297, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971). "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). *See also Bifulco v. United States*, 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Ladner v. United States*, 358 U.S. 169, 177–78, 79 S.Ct. 209, 213–14, 3 L.Ed.2d 199 (1958). However, a strict construction does not allow a court to disregard the purpose of Congress. *Moskal v. United States*, 498 U.S. 103, 113, 111 S.Ct. 461, 467–68, 112 L.Ed.2d 449 (1990). Where a literal reading of a statute is inconsistent with its clear legislative purpose, a less mechanical interpretation may be warranted. *Id.* Neither party cites to pertinent legislative history that facilitates gauging Congressional intent, and none has been found.

Supreme Court authority interpreting 18 U.S.C. §§ 641 & 649 is sparse and old.[4] In *United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910), the Court held that "fees and emoluments" collected by a clerk of a federal district court were not "money or property of the United States" within the meaning of the predecessor of 18 U.S.C. § 641. *Id.* at 529, 31 S.Ct. at 33. Clerks originally had been allowed to retain whatever surplus remained above their court expenses as their salary, but Congress later set a maximum of $3,500. The Court stressed that clerks were not required to keep separate accounts or render an account of the fees to the government, although they were subject to a half-yearly audit. *Id.* at 520–29, 31 S.Ct. at 29–33. But "even the duty to pay the surplus shown by the return or audit is not governed by the statutes

3. The Tenth Circuit's analysis in *Fernando* is not convincing. The Tenth Circuit noted that the predecessor statute of 18 U.S.C. § 649 was written before checks were commonly used, and that Congress had not updated the statute's language as it had done in other statutes. 745 F.2d at 1330. Least persuasive, but named as the most important factor, was the *Fernando* court's speculation, without reference to legislative history or other evidence, that "Congress *could have* envisioned that a much greater harm would result if a government official failed to deposit currency than if the same official failed to deposit negotiable documents such as checks.... [I]t may be fair to *assume* that Congress, perceiving the pos-

sibility that misuse of currency could occur more easily, intended the scope of § 649 to be restricted to currency only...." *Ibid.* (emphasis added).

4. Sections 641 and 649 were first enacted as 18 U.S.C. § 100, Act of March 4, 1909, ch. 321, § 47, 35 Stat. 1097, & 18 U.S.C. § 101, Act of March 4, 1909, ch. 321, § 91, 35 Stat. 1105, respectively. The sections have been amended and renamed several times, but with only minor alteration. Thus, pre–1948 cases interpreted the predecessors of 18 U.S.C. § 641 and § 649.

relating to embezzlement ... [because] [t]he amount with which the clerk is chargeable upon his accounting is not the 'public money' or 'the money or property of the United States.'" *Id.* at 531, 31 S.Ct. at 34. This is because the "fees and emoluments are not received by the clerk as moneys or property belonging to the United States, but as the amount allowed to him for his compensation and office expenses ... and with respect to the amount payable when the return is made, the clerk is not trustee, but debtor." *Ibid.*

The Court again reversed a conviction on the basis that the defendant was a debtor in *United States v. Johnston,* 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925). Johnston was prosecuted for embezzling government funds after he failed to pay taxes on admission fees collected at boxing matches. The Court held that Johnston was not a bailee, but instead a debtor, because the tax was paid within the price of the ticket, which was property of the promoter. *Id.* at 226–27, 45 S.Ct. at 496. The Court saw no reason "for requiring the ticket office of a theatre to create a separate fund by laying aside the amount of the tax on each ticket," and inferred from the government's requirement of monthly tax reports that "[it] does not look as if the Government were dealing with these people otherwise than with others answerable for a tax." *Id.* at 227, 45 S.Ct. at 496.

### III

In general, the pertinent cases can be classified as belonging to one of four types. First, there are cases where the stolen property clearly belongs to the government and federal jurisdiction is undisputed. Next, there are instances where the federal government or one of its agents acts as a custodian or bailee of property, so the transitory possession makes the property "of the United States." *See, e.g., Arbuckle v. United States,* 146 F.2d 657, 659 (D.C.Cir.1944) (affirming the conviction of the Senate Restaurant's manager for theft of sales receipts because restaurant was an "instrumentality of the United States created by Congress"); *Thompson v. United States,* 256 F. 616 (2d Cir.) (finding requisitioned sugar set aside for the government on a refiner's barge was

property of United States), *cert. denied,* 249 U.S. 617, 39 S.Ct. 391, 63 L.Ed. 804 (1919).

Third, there are cases where property or funds that came from the federal government are now in private hands, but the government has *retained* sufficient control so that they remain government property. For example, in *United States v. Foulks,* 905 F.2d 928 (6th Cir.1990), a Sixth Circuit decision discussed in the district court's opinion, this court affirmed the conviction of a Salvation Army director who misappropriated checks drawn on a special emergency relief account. The relief funding came from the Federal Emergency Management Agency ("FEMA"), which disbursed money to be administered by local relief agencies for their food and shelter programs. Because FEMA limited, dictated, and controlled the use of the funds, required the Salvation Army to account for their use, and required that any surplus be returned, the court held that the "funds retain their federal character even though deposited into accounts of non-federal agencies." *Id.* at 930. However, in *Foulks,* unlike this case, there was no doubt that the stolen funds were *originally* property of the federal government—the issue was whether they had *retained* this status after conveyance to another entity.

Conversely, the fourth category consists of cases where a government employee or agent has received property but failed to convey it to the United States, so that the question is whether it has *attained* the status of government property. This was the issue in *United States v. Benefield,* 721 F.2d 128 (4th Cir. 1983), a case heavily relied upon by the district court. The defendant, Mrs. Benefield, was a cashier at an NCO Club who was making arrangements for a private party. Benefield directed the client to make out four blank checks and then inserted her own name on a check that was intended as the staff's gratuities. *Id.* at 128–29. The court held that "the tip money was a 'thing of value of the United States'" within the meaning of § 641 "until disbursed to the entitled employees." *Id.* at 130.

In reaching its conclusion, the court in *Benefield* identified "as critical factors the basic philosophy of ownership reflected in

relevant statutes and regulations and the supervision and control contemplated and manifested by the government," citing *United States v. Evans*, 572 F.2d 455 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978). *Id.* at 129. However, *Evans* involved embezzlement by a collection agency whose clients held National Direct Student Loans, funds that originally came from federal government. This again illustrates that federal control, interest, and regulation are relevant only to the question of whether property *retains* its federal character, not whether it has *acquired* such a status. The *Evans* decision reveals as much: "[t]he statutes ... manifest an underlying congressional intent that the Office of Education should *maintain regulatory control* ...." *Id.* at 472 (emphasis added).

Although the Fourth Circuit's reasoning in *Benefield* may have been flawed, its ultimate conclusion was not. The stolen tips could properly be considered "money of the United States," not because the money *acquired* federal status, but because the defendant was a federal employee who acted as an agent for the government, thereby demonstrating constructive possession of the funds. In contrast, customs regulations show that "a licensed broker is the agent of the importer, not of the government...." *United States v. Federal Ins. Co.*, 805 F.2d 1012, 1013 (Fed. Cir.1986) (interpreting 19 C.F.R § 141.1(b)), *cert. denied*, 481 U.S. 1048, 107 S.Ct. 2179, 95 L.Ed.2d 835 (1987). Thus, the district court seemed to pay little attention to "the basic philosophy of ownership," the first critical factor identified in *Benefield.*

The Tenth Circuit similarly recognized the significance of actual ownership in *United States v. Owen*, 536 F.2d 340, 344 (10th Cir. 1976), where it held that "money received from private loans guaranteed by the United States Government" was not money of the United States, reversing a conviction under

§ 641.[5] The court's language discussing these loans is equally applicable to this case: "Assuming the private loans were in legal contemplation 'guaranteed' by the United States Government, the money never belonged to the United States. Even if it had to pay on the guarantees, the ultimate responsibility for payment rested with the local government agency." *Ibid.* The United States has as great an interest in seeing its student loans repaid as it does in collecting customs duties. The *Owen* court recognized this, but resisted the temptation to bootstrap a strong federal interest into federal jurisdiction beyond that authorized by the language of § 641.

■ The lower court's emphasis on the pervasive degree of federal regulation is misplaced. The district court erred in asserting that "the key factor ... [in determining] whether the Government has a sufficient interest in certain funds or items is the degree of its control over and interest in the 'thing of value' at issue," *Klingler*, 827 F.Supp. at 1291, because it ignores the plain language of the statute and the rule of narrow construction for penal statutes. Federal control and supervision is relevant where money originated in the federal government and the question is whether the government has retained its interest in the property; such an inquiry is out of place where money has yet to *acquire* any federal character. Although Congress might be able to extend federal jurisdiction solely on the basis of a "federal interest" in stolen property (*but cf. United States v. Lopez*, — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)), it did not choose to do so through these statutes. Moreover, the language of the statutes does not criminalize the embezzlement or conversion of funds or property that the federal government merely has an interest in or pervasively regulates, but rather "money or a

**5.** The district court rejected Klingler's citations to *Owen* and *United States v. Tana*, 618 F.Supp. 1393 (S.D.N.Y.1985), for the proposition that a security interest in property was not property of the United States. The district court correctly noted that the *Tana* court addressed several factors in determining jurisdiction, including the degree of federal control over the property. However, the district court ignored the *Tana* court's conclusion that the property was not owned by the government, a finding that was dispositive: *"At no time were these assets United States property. The federal government never had title in, or possession of, or control over them.* The Government's interest was inchoate; it could not subject the pledged assets to substantial federal control unless and until YPG defaulted on the loan." *Id.* at 1396 (emphasis added).

thing of value of the United States." Further, the use of the possessive phrasing *"of the United States"* confirms that federal *ownership* of stolen property is a jurisdictional imperative. *See United States v. Morris,* 541 F.2d 153, 154 (6th Cir.1976) ("The essence of this offense . . . is that the check was the property of the Department of Agriculture."); *United States v. Crawford,* 52 F.Supp. 843, 845 (E.D.Pa.1943) ("[A] defendant may not be convicted . . . where there is no evidence that the United States was the owner of the property stolen."); *Thompson,* 256 F. at 618 ("can the sugar be said to belong to the United States, or to be the property of [it]?").

■ Under the government's rationale, a common thief who robs a liquor store could be prosecuted under § 641 because the cash register contains nascent FICA taxes or a portion of the business's income taxes due to be paid later that quarter. Clearly, an intention that money be delivered to the United States is insufficient to make it government property.

## IV

What meager Sixth Circuit authority exists supports Klingler's position that the customs duties were not government property. In *United States v. Morris,* the defendant was Executive Director of KAL–CAP, a program that provided needy children with school lunches. 541 F.2d at 154. Morris deposited a check written to KAL–CAP by a private day care company into an dormant checking account that he had access to. KAL–CAP received funds from the United States Department of Agriculture ("DOA"), the Department of Labor, HEW, Michigan state agencies, and private sources, as well as generating some income from its food service operations. *Ibid.* Although DOA provided funds for school lunch programs, the court dismissed the charge because "the evidence fails to show that the proceeds of the check . . . were the property of [DOA]." *Id.* at 155. More significantly, "assuming that KAL–CAP's funds belonged to the [DOA], the check never got into [KAL–CAP's] possession. *Until delivery, the check was still the*

*property of [the payor]." Ibid.* (emphasis added).

*Morris* is consistent with *United States v. Collins,* 464 F.2d 1163 (9th Cir.1972), where the court held that a defendant who falsely endorsed a warrant for funds stole money of the bank, rather than of the government, which had deposited the funds into the bank account. There was no dispute that the funds in the checking account were government money:

> The Labor Department forwarded United States Treasury checks . . . marked for deposit in a special bank account. . . . The Labor Department contract required the City Treasurer to maintain [the] special bank account. . . . The United States held a lien upon the credit balance in the special account superior to any lien of the [bank]. The Labor Department contract provided that all monies deposited . . . were public monies and that title to all property furnished by the United States would remain in the United States.

464 F.2d at 1164.

The court in *Collins* reached two conclusions that are relevant to this case. First, "[t]he proceeds of a warrant negotiated by a thief are the property of whomever he may have convinced to make payment thereon." *Id.* at 1165; *cf.* U.C.C. § 4–401. Second, "[i]t is an essential element of the crime of stealing Government property in violation of 18 U.S.C. § 641 that the Government have suffered an actual property loss." *Ibid.*

*United States v. Reed* is a recent case with facts resembling Klingler's. 851 F.Supp. 1296 (W.D.Ark.1994), *aff'd,* 47 F.3d 288 (8th Cir.1995). *Reed* involves a lawyer who stole money intended to pay a client's income taxes. After criticizing the defendants in the case and delivering a stinging commentary on the declining reputation of lawyers, the court acquitted the defendant of stealing government property. *Id.* at 1297–98, 1312. The defendant was a lawyer who had convinced and cajoled several clients into depositing large sums of money into his trust account, which he then allegedly used for personal transactions. *Id.* at 1299–1305.

The court first discussed the extant Supreme Court (*Johnston* and *Mason*) and Eighth Circuit authority, concluding:

> [T]he checks written on the account, payable to the [IRS] ... did not become government property because they were never delivered to any agent of the United States. Surely, the mere writing of a check to another does not make the amount specified in that check the property of the person to whom it is payable unless and until it is actually delivered to that person.

*Id.* at 1311. The *Reed* court was direct in dismissing the authority of the opinion below in this case: "The *Klingler* case was apparently not appealed and this court has doubt that it follows the law as expressed in the United States Supreme Court cases discussed above." *Ibid.*

█ We reject the Government's argument that Klingler stole money of the United States because "the money was specifically earmarked as, and understood by defendant and her clients to be, estimated customs duties that were to be promptly paid to the U.S. customs service." *Resp. Brief* at 5. The Government also argues that "there is a substantial federal interest in the integrity of customs business and the collection of government revenues through custom duties." *Resp. Brief* at 6. The government notes that the importation of goods is a heavily regulated area of commerce and extensively cites to the Code of Federal Regulations to illustrate this point. This is irrelevant to the *creation* of federal jurisdiction. This case does not require us to determine whether a statute *could* be constitutionally crafted so as to include the funds Klingler stole, but only whether the funds fall within the statute as it is actually written. This court will not expand the scope of federal jurisdiction beyond what Congress has mandated, regardless of the wisdom of such an expansion—any policy arguments should instead be directed at Congress.

## V

The district court erred in several respects. First, the court failed to discern that *Benefield* is inapplicable because in that case, the defendant took possession of the stolen money as an agent of the government. Likewise, the district court misinterpreted *Foulks,* which involved the *retention* of federal ownership of property instead of the *creation* of such a status, and it also failed to discuss, or properly consider, a great deal of relevant caselaw: *Morris, Mason, Johnston, Collins,* and *Federal Insurance.* Finally, the district court erred in relying on its judgment that its decision "offers more protection to the Government's funds than does the Tenth Circuit's narrower reading which could be used to insulate more strategic conversion of Government money from prosecution." *Klingler,* 827 F.Supp. at 1294. A failure to find federal jurisdiction in this case only means that a state court must prosecute Klingler, something states have done competently for two centuries. Given the crowded federal docket, a criminal may find a federal court more hospitable than its state counterpart. Regardless of which forum is more efficient or a better deterrent, the fact remains that Klingler cannot be convicted within the plain language of the statute, accepted rules of statutory construction, and federalism.

The funds stolen by Klingler never acquired the character of United States property, and consequently, there is no federal jurisdiction. We therefore REVERSE the district court's judgment of conviction.