UNITED STATES of America,
Plaintiff–Appellee,

v.

Francis Anthony LITTRIELLO,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Michael Paul TURNER,
Defendant–Appellant.

Nos. 88–5540, 88–5541.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 4, 1988.

Decided Feb. 8, 1989.

Margaret Brooke Murdock, Asst. Federal Public Defender (Fred Warren Bennett, Federal Public Defender; John Henry Lew-

in, Jr., Venable, Baetjer & Howard, on brief) for defendants-appellants.

Katharine Jacobs Armentrout, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., on brief) for plaintiff-appellee.

Before MURNAGHAN, CHAPMAN, and WILKINS, Circuit Judges.

MURNAGHAN, Circuit Judge:

The appellants, Francis Anthony Littriello and Michael Paul Turner, skimmed over $1.2 million dollars from the American Postal Workers Union Health Plan. They were convicted of embezzling U.S. government funds. Their sole contention on appeal is that the embezzled monies were not U.S. government funds. We find the embezzled health plan funds were monies of the United States within the meaning of 18 U.S.C. § 641.

The American Postal Workers Union Health Plan is a federal employee health benefit plan as defined in 5 U.S.C. § 8901 *et seq.* Its origin stems from the Federal Employees Health Benefit Act, which required the federal government to establish health care plans for all federal employees. One type of plan established was the "Employee Organization" health plan—a health insurance scheme established by an employee organization connected to the federal government. One such plan was the American Postal Workers Union Health Plan ("the Health Plan"), operated by the American Postal Workers Union under a contract with the Office of Personnel Management (OPM).

The federal government pays the premium for each employee covered by the plan; it contributes a portion of the premium and deducts the remaining portion from the employee's wages. The money is sent to the Health Plan by OPM twice monthly.

The contract between the Health Plan and OPM ("the contract") requires that all funds received from the federal government that are not needed for the immediate payment of claims must be invested. The investment requirement minimizes the cost of the health plan to the government as the

money earned helps offset the cost of the premiums.

Premium money not required for immediate payment and any interest thereon are designated the Special Reserve Fund. The contract requires that any money earned as interest on the investment of monies of the Special Reserve Fund must be credited to the Special Reserve Fund. The contract further requires that investments must maximize the investment fund with regard to the "safety and liquidity" of the funds.

At the end of each year, the amount of money in the Special Reserve Fund is examined when calculating the amount of next year's premium—the more money in the fund, the lower the premium. If the contract between the Health Plan and the government is cancelled, all monies in the Special Reserve Fund revert to the OPM.

The federal government exercises supervision and control over the fund in various ways. The Health Plan is required to submit several reports to OPM: a monthly cash analysis, and a semi-annual and annual accounting summary.[1] The Health Plan is required to submit to an audit by a certified public accounting firm at the end of every calendar year. The OPM staff also conducts a cycle of audits themselves.

Littriello and Turner ("the defendants"), the comptroller and accounting supervisor respectively of the Health Plan, secretly invested nearly seventy-five million dollars of the Health Plan's Special Reserve Fund with high risk/high interest savings and loan associations while officially listing the investments at low interest, federally insured banks. The defendants then skimmed off over 1.2 million dollars, the difference between the actual and listed interest. The defendants were subsequently indicted on five counts: conspiracy to embezzle in violation of 18 U.S.C. § 371, three substantive counts of embezzlement of government funds in violation of 18 U.S.C. § 641 and making a false statement to an agency of the United States government in violation of 18 U.S.C. § 1001. The defendants were tried before a jury, and convicted on all counts.

The defendants now contend they were erroneously convicted of violating 18 U.S.C. § 641, which provides in pertinent part:

> Whoever embezzles ... any record, voucher, money or thing of value of the United States or of any department or agency thereof, ... shall be fined not more than $10,000 or imprisoned not more than ten years.

The defendants contended at trial and now on appeal that the embezzled funds were not monies or things of value to the United States.

In *United States v. Benefield*, 721 F.2d 128 (4th Cir.1983), we were faced with determining whether a Fort Belvoir Officer's Club cashier who embezzled tip money had taken any "money or thing of value of the United States" under § 641. We endorsed the following test:

> In determining whether an interest qualifies as "any ... money, or thing of value of the United States" under 18 U.S.C. § 641, courts have identified as critical factors the basic philosophy of ownership reflected in relevant statutes and regulations and the supervision and control contemplated and manifested by the government.

721 F.2d at 129 (citations omitted). *See also id.* at 129 n. 2 (reviewing cases where federal connection was held to be insufficient). The court determined the tip money *did fall within the scope of § 641.* The court pointed towards Army accounting procedures for nonappropriated funds and standard (though unwritten) operating procedures at the club, which required that tips be deposited in the club bank account and reported to central accounting. The tips, the court held, were a thing of value to the United States until actually disbursed to the employees.

The government contends that here, as in *Benefield,* there is sufficient evidence of government ownership, supervision and

---

1. The accounting summary is used in setting premiums for the next year and ensuring the government's contract charges are appropriate.

control to sustain the convictions. The defendants contend that the nexus between government interests and the subject fund is too tenuous. While some intended philosophy of control may be present, they maintain, the government has not actively supervised or manifested its control over the fund. To buttress their argument, the defendants point to several cases from other circuits where federal control was held insufficient.

While the contours of sufficient federal control for the purposes of § 641 may be blurred, here we believe it clearly exists, substantiated by significant regulatory provisions far more extensive than those in *Benefield.* The precedent proffered by the defendants can be easily distinguished. A review of the evidence adduced at trial demonstrates the government has met its burden of establishing the federal character of the embezzled monies.

The government introduced substantial evidence of federal control and supervision over the Special Reserve Fund:

(1) Federal regulations require that all federal employee health plans must establish a Special Reserve Fund and maintain and account for it separately from other plans. 5 C.F.R. § 890.201.

(2) All Special Reserve Funds must be invested and all interest earned must be credited to the fund. *Id.;* 41 C.F.R. § 16–7.503–6.

(3) If the Health Plan's contract is terminated or approval of the plan is withdrawn, the Special Reserve Fund must be returned to the United States. 5 C.F.R. § 890.201(a)(8).

(4) The Health Plan must "seek to maximize investment income with due considerations to the safety and liquidity of investments." 41 C.F.R. § 16–7.503–6.

(5) If the Health Plan fails to invest the money or to "maximize investment," the OPM contracting officer may direct the carrier to credit the Special Reserve Fund for investment income that would have been earned had the Plan complied with regulations, at a rate equal to the semi-annual rate determination of the Secretary of the Treasury under the Renegotiation Act of 1951 (50 U.S.C.App. § 1211 *et seq*).

(6) Three clauses of the Health Plan's contract specifically *repeat* most of the above requirements.

(7) The funds cannot be spent at the discretion of the Health Plan; they can be disbursed only for obligations of the contract.

(8) The amount of money in the Special Reserve Fund is itself a thing of value to the United States, because, as it increases, it decreases the actual premiums the government must pay.[2]

In addition, other regulations and provisions dealing with the Health Plan generally support the scheme of supervision:

(1) A health plan must keep detailed records relating to its financial status. 5 C.F.R. § 890.202.

(2) A health plan must furnish an annual accounting of its operations to OPM, including the income on investments.

(3) The Health Plan must furnish, upon request of the OPM, other reasonable financial reports as required. Here the OPM actually required the Health Plan to file a monthly cash analysis report, detailing the monies paid by the Health Plan and the amount of investment income earned per month, and a semi-annual accounting statement.

(4) The Health Plan must submit to audits by the OPM, 5 C.F.R. § 890.202, 41 C.F.R. § 16–7.504–2, and a yearly audit by a Certified Public Accountant firm.[3]

The defendants assert the regulations are insufficient to establish governmental control over the fund. They "neither establish the manner and means of investing the Special Reserve Fund nor require type

---

**2.** The government's premiums are based on the expenses of the plan (claims plus administration cost) minus the investment income earned by the Special Reserve Fund.

**3.** The government also points to unwritten standard operating procedures of the Health Plan (citing *Benefield* ). These, however, seem for the Health Plan's benefit, not the government's, and do not further manifest federal control.

of investment or rate of interest".[4] Brief of Appellant at 7.

In essence, the defendants' argument appears to be that the lack of specified direction in the regulatory scheme cedes any federal control over the Special Reserve Fund to the private concerns of the Health Plan—a specious contention. Broad direction does not equate to no direction, or no concern. In what some may regard as an already over-regulated economy, the government may have merely decided that individual initiative on the part of the Health Plan with certain minimum safeguards may be the best means of accomplishing both goals of the fund—preserving a pool of government supplied funds to pay health claims and ensuring that those funds are not left idle when they could be generating income to defray government expenses.

The defendants point to several cases where funds that have originated with the government were found by the courts to have lost their federal character. *See United States v. Tana,* 618 F.Supp. 1393 (S.D.N.Y.1985) (defendant stole private company materials that had been used to secure Department of Commerce Economic Development Administration loan); *United States v. Freeman,* 443 F.Supp. 288 (N.D. Calif.1977) (defendant indicted for failure to turn over profits earned when he used his Comprehensive Employment and Training Act loan to rent trucks for commercial hauling rather than the loan's intended purpose, establishing a truck school); *United States v. Gavin,* 535 F.Supp. 1345 (W.D. Mich.1982), *aff'd,* 718 F.2d 1101 (6th Cir. 1983) (defendant converted funds from SBA loan which were diverted after possession of an intermediate conduit).[5]

Such cases, however, are inapposite. Two, *Tana* and *Gavin,* involve loans, and the third, *Freeman,* concerns embezzled

income from a wholly separate and private activity of the defendant. *See also United States v. Heber,* 518 F.Supp. 868, 872 (W.D. Wis.1981) (questioning § 621 analysis in *Freeman* and declining to follow).

The case at bar is factually more on point with cases dealing with monies paid out under a contract for services or with monies in which the government retained a reversionary interest. In *United States v. Johnson,* 596 F.2d 842 (9th Cir.1979), HUD funds were transferred to a San Francisco redevelopment agency and then, by a public park and mall maintenance contract, to a local union. The union president embezzled the funds and was charged with violating § 641. The court found the monies were federal funds, focusing on the agency's requirement to comply with financial accounting and reporting requirements and the union's contractual requirement to permit HUD to have access to the records at reasonable times as indicative of sufficient federal supervision and control over the funds.

In *United States v. Scott,* 784 F.2d 787, 791 (7th Cir.), *cert. denied,* 476 U.S. 1145, 106 S.Ct. 2257, 90 L.Ed.2d 702 (1986), the court found federal supervision and control over embezzled community agency funds where:

1. Over 98% of funding for the agency came from federal sources, i.e. state and county agencies providing funds under programs entirely funded by federal grants.

2. The government regulated how money could be spent.

3. It monitored and audited the progress of the grants and contracts.

4. It required periodic reports.

5. It could demand repayment if the money was either unspent or improperly spent.

---

4. Though presumably a failure to "maximize investment," say investing at below market rates, could be penalized by recouping the lost interest under 41 C.F.R. § 16–7.503.6.

5. Interestingly, the *Gavin* court emphasized the absence of a federal reversionary interest in the funds, which is certainly present here. *See also United States v. Maxwell,* 588 F.2d 568, 571–73

(7th Cir.1978) (holding government's retained right to reallocate unused student loan funds disbursed to a college rendered the institution a "trustee" of the United States and constituted a sufficient beneficial interest to bring the funds within the ambit of § 641), *cert. denied,* 444 U.S. 877, 100 S.Ct. 163, 62 L.Ed.2d 106 (1979).

*See also United States v. Heber,* 518 F.Supp. at 872 (Regulations requiring educational grant recipients to retain any income earned by the grant, to use income only as specified by governmental regulations and the terms of the grant, and to comply with certain accounting and reporting procedures "evince[d] sufficient indicia of control on the part of the government to withstand a motion to dismiss.").

We are satisfied that the applicable regulations and contract provisions, combined with the retained reversionary interest, provide sufficient indicia of supervision and control to classify the Special Reserve Fund as federal monies within the meaning of § 641.

The defendants urge that, even if intended, the government has not exercised practical control or supervision over the Special Reserve Fund. They point to the allegedly cursory nature of the "desk reviews" of the annual accounting statement, the tardiness of the more thorough "periodic" audit (the last audit completed, in 1986, was for the year 1981), and the failure of the government to detect any discrepancies in the investment account.[6]

The argument is not meritorious. The control envisioned by the federal regulatory scheme has been to a great degree manifested by the government. That fact that required steps are accomplished, not the individual quality of each check, is the key. Furthermore, additional checks are built into the system. The defendants gloss over the required yearly audit by a CPA firm, which supplements the OPM audits whose thoroughness they allege is lacking. Reports are required and submitted. Even assuming *arguendo* the posted sentry is sleeping, the very presence of a guardian indicates the property has not been abandoned.

The judgments of convictions are accordingly AFFIRMED.

---

6. Indeed, the defendants with some audacity argue that the government's failure to detect their illegal activities sooner is an indication of the questionable quality of the actual federal supervision manifested over the account.