UNITED STATES of America,
Appellee,

v.

David McKAY, Defendant,

Brian McKay, Defendant–Appellant.

Docket No. 00–1549.

United States Court of Appeals,
Second Circuit.

Argued Feb. 12, 2001.

Decided Dec. 21, 2001.

See also, 70 F.Supp.2d 208.

James Miskiewicz, Assistant United States Attorney, for Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY, (Cecil C. Scott, on the brief), for Appellee.

Norman Trabulus, New York, NY, Storch, Amini & Munves, P.C., for Defendant–Appellant.

Before: VAN GRAAFEILAND, KEARSE, and LEVAL, Circuit Judges.

LEVAL, Circuit Judge.

The indictment charged Brian McKay, *inter alia*, with a substantive violation of 18 U.S.C. § 641, as well as conspiracy to violate that statute, through a scheme to steal funds from the rent subsidy program of the United States Department of Housing and Urban Development ("HUD"), governed by Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f ("Section 8"). The principal issue on appeal is whether the evidence showed that the money that McKay stole was money "of the United States" within the meaning of Section 641. We affirm the conviction.

Viewed in the light most favorable to the government, the evidence at trial demonstrated the following:

Defendant Brian McKay is the nephew of David McKay, who from 1993 to 1998 was the chairman of the Board of Commissioners of the Huntington Housing Authority ("HHA"). The HHA was described at trial as a quasi-governmental entity in the town of Huntington, New York, which owns and operates public housing and administers public housing programs. Among other duties, the HHA administers the Section 8 rent subsidy program in the town of Huntington. Edith Smith–Embler, the former executive director of the HHA, explained that HHA administers

> a rent subsidy program funded by the federal government through the Department of Housing and Urban Development. It is a program in which people find rental housing on the private market under certain guidelines set by the Department of Housing and Urban Development. Based on their income they pay a certain percentage of their income toward the rent, and the Huntington Housing Authority with the money supplied by HUD helps pay the remainder of the rent directly to the landlord.

In administering the Section 8 program, the HHA acted as a middleman between HUD and the landlords who eventually received the Section 8 checks. As Smith–Embler explained, the money for the Section 8 program was wired from HUD in Washington, D.C., to the HHA, and the HHA would then issue checks to landlords paying rent for the beneficiaries of the program.

The federal subsidy program required HHA to comply with HUD regulations in administering the Section 8 program. Smith–Embler testified that only tenants whose incomes fell within income guidelines established by HUD would qualify to

receive rent subsidies from HHA. HUD's regulations controlled various aspects of policy to be followed by the HHA. HUD's conflict of interest regulation forbade any local public housing agency from paying subsidized rent to any landlord who is a person in a policy-making position at the local agency. *See* 24 C.F.R. § 982.161(a)(1).

As Chairman of HHA's Board of Commissioners, David McKay was disqualified by the HUD conflict of interest regulation from receipt as a landlord of subsidized rental payments. He owned a building located at 7 Hilltop Avenue in Huntington, New York, which had two apartments, one upstairs and one downstairs. When the events giving rise to this action began, the upstairs apartment was occupied by his sister, Ruth Lott, who was also the defendant Brian McKay's mother. In 1992, Enrica Lott, Ruth Lott's daughter and the defendant Brian's sister, wanted to occupy the basement apartment in the same building, paying for part of her rent with Section 8 funds. On November 30, 1992, HHA entered into a contract for Section 8 assistance for Enrica Lott's rental of the basement apartment, listing Ruth Lott, instead of David McKay, as the owner of the apartment. On the same day, Ruth Lott, as owner, and Enrica Lott, as tenant, entered into a one-year lease agreement purporting to rent the basement apartment at 7 Hilltop Avenue.

In December 1992, rent subsidy payments in the amount of $867 per month began to be paid from HHA to Ruth Lott for the apartment occupied by Enrica Lott. Beginning in April 1993, HHA's rent subsidy payments began to be paid to Brian McKay, rather than to Ruth Lott. The HHA file contained no contemporaneous explanation for why Brian McKay was substituted for Ruth Lott. The file did contain a lease amendment, dated November 30, 1993, signed by Brian McKay, in which Brian McKay represented himself as the owner of 7 Hilltop Avenue and stated that Enrica Lott would be living there.

On July 13, 1993, three months after the rent subsidy checks began going to Brian McKay, Enrica Lott was admitted to a residential drug rehabilitation program. She therefore moved out of the 7 Hilltop Avenue apartment. Two months later, in September or October, 1993, that basement apartment was rented to Barbara Jean Brister, who lived in it nearly six years until the middle of 1999. Brister paid her rent in cash each month to David McKay. However, through October 1995, HHA continued to send rent subsidy checks financed by Section 8 funds to Brian McKay to subsidize the tenancy of Enrica Lott, who no longer lived in the apartment.

The checks that HHA sent to Brian McKay were deposited in David McKay's account at National Westminister Bank. On November 1, 1994, David McKay and Brian McKay opened a joint savings account at the National Westminster Bank. The signature card used to open the account had Brian McKay's signature on the front and a photocopy of his New York Driver's License on the back. The evidence showed that David McKay made numerous deposits into the joint account, which were withdrawn by Brian McKay. Between April 1, 1994, and September 1995, virtually all the money was withdrawn from the joint account. The date of the last withdrawal from the joint account was near the date on which Enrica Lott obtained Section 8 funding to rent in a different location. After September 1995, the McKays never again used the joint account.

In 1996, Brian McKay was interviewed by Special Agent Ann Petterson of the Internal Revenue Service. Petterson

asked Brian McKay about the checks, his status as the landlord of 7 Hilltop Avenue, and the joint bank account. Petterson testified that McKay said he was not the landlord of 7 Hilltop Avenue:

> He said his uncle was part of the Huntington Housing Authority, he was the head of it, and wasn't allowed to participate in their Section 8 rental program. So they had a deal where Brian McKay was the landlord on paper. He said for his participation and the deal with his uncle he got one or two hundred dollars a month from the checks, the proceeds of the checks. He said they had opened a joint bank account, and that was a means in which he would get some of the money.

On April 1, 1999, Brian McKay and David McKay were charged in a 12 count indictment with various offenses including the embezzlement of approximately $29,285 in government funds and money laundering conspiracy in connection with these thefts. The district court granted David McKay's motion for a severance. Brian McKay was then charged in a superseding indictment with the three counts actually tried. The charges included one count of conspiracy to steal money of the United States in violation of 18 U.S.C. § 641 and make false statements in a matter within the jurisdiction of the United States, in violation of 18 U.S.C. § 1001; one substantive count of theft of government funds under § 641; and one count of money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(h). After a jury trial, he was convicted on all counts of the indictment, and was sentenced to 13 months' imprisonment and three years' supervised release. This appeal follows.

### Discussion

■ Section 641 makes it a criminal offense to "embezzle[ ], steal[ ], [or] purloin[ ] ... any ... money, or thing of value of the United States or any department or agency thereof." 18 U.S.C. § 641. McKay's main argument on appeal is that the government did not prove that the rental payments made to him by HHA, pursuant to his fraudulent arrangement to conceal his uncle's illegal receipt of rental payments subsidized by Section 8, constituted "money of the United States." He contends that, because HUD had transferred the Section 8 funds to HHA to finance rent subsidies, the money ceased to belong to HUD. However, we stated in *Hayle v. United States* that federal grant money remains money "of the United States" within the meaning of § 641, notwithstanding prior transfer to a local administrator, "so long as the government exercises supervision and control over the funds and their ultimate use." 815 F.2d 879, 882 (2d Cir.1987) (internal quotation marks omitted). McKay contends that in order to satisfy *Hayle*'s requirement of "supervision and control," the government needed to show something more than federal regulations governing the handling of the money, such as evidence that HUD officials were actually involved in supervising the HHA in its administration of the Section 8 program.

We reject his argument. Notwithstanding that HUD's funds had been transferred to HHA, its local agency, before rental payments were made to McKay, the evidence at trial demonstrated that the United States government exercised considerable control over the disposition of the funds. Control was exercised at two levels. First, HUD placed restrictions on the HHA in its role as administrator of the Section 8 program. Once the HHA had received Section 8 checks from HUD, it was obligated to comply with HUD's regulations for the administration of the Section 8 program and could use Section 8 funds only to subsidize the rent of tenants who fell within HUD's income guidelines. The HUD conflict of interest regulation,

for example, prohibited HHA from paying funds derived from Section 8 subsidies to any landlord who occupied a policy-making position with HHA.

Second, HUD's regulations placed restrictions on landlords who received rental payments from a local agency that were subsidized by Section 8 funds. The contract that Ruth Lott signed with HHA in order to receive Section 8 subsidies required her to comply with numerous HUD regulations as a condition of receiving Section 8 funding. The contract is captioned "U.S. Department of Housing and Urban Development: Section 8 Housing Assistance Payments Program." The contract requires the owner to sign a lease with the tenant that shall "contain all provisions required by HUD and shall not contain any provisions prohibited by HUD." The contract states that the tenant's portion of the "Contract rent" (the total monthly rent payable to the owner of the unit) shall be "an amount determined by the [HHA] in accordance with HUD regulations and requirements." The contract also provides that the Contract rent will be adjusted based on the Section 8 Annual Adjustment Contract published by HUD in the Federal Register. The contract provides that the HHA may terminate housing assistance payments under the contract if, *inter alia,* the tenant family has committed any fraud in connection with any federal housing assistance program, or if the family has "violated any of the Family's obligations under the Section 8 Existing Housing Program." The owner of the housing agrees, in the contract, to "maintain and operate the Contract unit and related facilities to provide decent, safe and sanitary housing in accordance with 24 CFR Section 882.109." The owner also agrees to "comply with HUD regulations regarding security deposits from a tenant (24 CFR Section 882.112)." The owner must cooperate with HUD's regulations regarding nondiscrimination in housing. The owner must coop-

erate with HUD in conducting equal opportunity compliance reviews. The owner must provide HUD with reasonable information pertinent to the contract, and must permit HUD to have access to the premises and the ability to access business records to determine compliance with the contract. The contract also contained the conflict-of-interest restriction mandated by the HUD regulation, specifying that no present or former member or officer of the HHA and no employee who formulates policy or influences decisions, may have any direct or indirect interest in the contract or in any proceeds or benefits arising from the contract.

In sum, the evidence at trial demonstrated that, notwithstanding the prior transfer of the Section 8 funds from HUD to its local agent HHA, HUD continued to exercise substantial control over the funds and their ultimate use. Despite the lack of evidence that federal officials actively supervised compliance with the federal requirements, the evidence of the restrictions and conditions placed by HUD on the use of the funds it furnished satisfied the requirements of *Hayle.* The evidence sufficiently proved theft of money of the United States in violation of § 641.

*Conclusion*

We have reviewed McKay's other arguments on appeal, particularly his claim that the evidence failed to demonstrate his knowing complicity in the scheme, and found them without merit. Finding no error, we affirm the judgment of conviction.