*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0441p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*


　　　　*v.*

Nos. 07-5918/5919

REGINALD L. HALL (07-5918) and DAVID F.
REEDER (07-5919),

　　　　　　　　*Defendants-Appellants.*

_____

Appeal from the United States District Court

for the Eastern District of Tennessee at Knoxville.

No. 05-00036—Thomas A. Varlan, District Judge.


Submitted:  October 24, 2008

Decided and Filed:  December 10, 2008

Before:  MOORE and WHITE, Circuit Judges; VINSON, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:**  Robert B. Tuten, TUTEN LAW OFFICES, Huntsville, Alabama, for Appellants.  Francis M. Hamilton III, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

_____

[*]The Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

1

———————————

**OPINION**

———————————

WHITE, Circuit Judge. Defendants-Appellants Reginald Hall and David Reeder appeal their convictions and sentences; Hall was convicted of conspiracy to commit money laundering, theft of government property, and money laundering, and Reeder was convicted of aiding and abetting money laundering. Hall contends that the district court erred in denying his motion to dismiss the indictment on the ground that the funds at issue were not government property for the purpose of 18 U.S.C. § 641. In addition, defendants claim that the government failed to present sufficient evidence to establish all the elements of theft, and that their convictions must therefore be vacated. We conclude that the government adequately established both that the funds were government property and that a theft was committed, and **AFFIRM**.

## I.    BACKGROUND

### A.    Facts

Hall established Advanced Integrated Management Services, Inc. ("AIMSI"), which provided environmental, information technology, engineering and nuclear detection services to the United States government. AIMSI was awarded several cost-reimbursement subcontracts by the prime contractor of the Oak Ridge National Laboratory ("ORNL") in Tennessee. ORNL is funded entirely by the United States Department of Energy but managed by a private contractor.[1]

Pursuant to the terms of its subcontracts, AIMSI was reimbursed by the government for a portion of its indirect costs related to performance of the subcontracts in the form of a biweekly advance, calculated using a provisional rate, or estimate, set at the beginning of the fiscal year. These advances are referred to in government contracting as "interim reimbursements." AIMSI's subcontracts required it to perform

---

[1] From 1995 to 2000, the prime contractor was Lockheed Martin Energy Systems, Inc.; the current prime contractor is UT-Battelle.

a year-end reconciliation comparing the interim reimbursements it received with the actual overhead expenses it incurred. (JA 1549-59.) If the overhead expenses it incurred were less than the total of interim reimbursements received, AIMSI was required to return the overpayment to the Department of Energy through the prime contractor.

In 1996, 1999 and 2000, Hall prepared fraudulent purchase orders for work that was never performed. At Hall's direction, Stan Stevens,[2] the owner of SWS, Inc., and David Reeder, the owner of Biosterile Technology of Tennesee, then submitted fraudulent invoices from their businesses requesting payment from AIMSI. After receiving payment for the fictitious work, Stevens and Reeder remitted a substantial portion of the funds to other companies owned or controlled by Hall.

AIMSI used Deltek, a sophisticated accounting software program, to track its business expenses and revenue. (JA 1068-70.) Within the Deltek system, Hall categorized payment for the fraudulent transactions as indirect costs related to AIMSI's subcontracts with the prime contractor.

At any given time, a certain amount of the funds in AIMSI's general bank account were derived from the receipt of interim reimbursement funds from the government. At trial, the government's expert witness, Alice Peterson, provided testimony demonstrating that the checks that Hall provided to SWS and Biosterile for fictitious work were honored at least in part with interim reimbursements AIMSI had received. Peterson demonstrated that 19.6% of the payments for fictitious work drawn from AIMSI's bank account in fiscal year 1996 were derived from interim reimbursements. In fiscal year 1999, the percentage was 51.6%, and in 2000, it was 26.9%. (JA 1578-1589.) Peterson applied these percentages to the payments for fictitious

---

[2]Stan Stevens entered into an agreement with the government and pleaded guilty to conspiracy to launder money in violation of 18 U.S.C. § 371. Stevens testified against Hall at Hall and Reeder's joint trial. Stevens stated that neither he nor his company, SWS, performed any work related to the false purchase orders and invoices. (JA 1127-28, 1135, 1146, 1150-52, 1170, 1178, 1182, 1190, 1195, 1197, 1202, 1211-13, 1219.) Stevens testified that he was allowed to retain a portion of the stolen money as payment for his involvement. On one occasion, when Stevens received a $25,000 payment from AIMSI for fictitious work, he paid $22,125 to Lynn and Associates, a company owned by Hall's wife. He was permitted to keep $2,808.75 as payment for his part in the transaction. (JA 1154.) On another occasion, Stevens retained $500 of a $25,000 fraudulent payment from AIMSI. (JA 1155.)

work to determine that Hall stole approximately $57,000 in government funds over the course of several years.

Each month, Hall's accountant provided him with a monthly summary comparing the amount of interim reimbursements AIMSI had received to the actual overhead costs it had incurred to date. (JA 1384-85.) This summary informed Hall whether his overhead costs were on track with the provisional reimbursements. In both 1999 and 2000, Hall's September summary, which he received just a few weeks before the conclusion of the fiscal year, indicated that he had not incurred indirect expenses at the rate predicted by the provisional rate, and thus, that he would be required to return the overpayments to the government. (JA 1412-1416.) However, late in September both years, Hall authorized payment of approximately $35,000 to SWS and Biosterile, respectively, for fictitious work. (*Id.*) The payments to these two companies — both booked to overhead accounts within AIMSI's Deltek software — ensured that AIMSI's overhead expenses for those years met the government's interim payments, allowing AIMSI to retain all of the interim reimbursement funds it had received.

At the end of each fiscal year, AIMSI was required to certify that all overhead expenses claimed were actually incurred and allowable under the terms of the subcontracts and federal regulations. In its year-end documents for fiscal years 1996, 1999, and 2000, AIMSI certified that all the expenses it had billed as overhead, including the amounts booked pursuant to the fraudulent invoices, were actually incurred and allowable under the federal regulations. (JA 1597-98.)

## B.    Trial Court Proceedings

The indictment charged Hall with theft of government property in violation of 18 U.S.C. § 641.[3] Hall filed a motion to dismiss the indictment on the ground that the

---

[3]18 U.S.C. § 641: **Public money, property or records**
Whoever embezzles, steals, purloins or knowingly converts to his use or the use of another. . . any record, voucher, money, or thing of value of the United States or of any department or agency thereof. . . .
Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

funds at issue were not property of the United States. The district court denied the motion, stating:

> [T]he record reflects that there are indicia of government supervision and control over the funds at issue, such as the requirement that AIMSI adopt an acceptable method of accounting and that its accounts are subject to audit by UT-Battelle and/or the government. Most importantly, AIMSI is required to submit a final indirect cost submission at the conclusion of the contract which could result in funds being repaid to the government. . . .[T]he Court cannot conclude as a matter of law on the present record that the funds at issue were not 'money . . . of the United States.'

(JA 269.)

At the close of the government's proofs at trial and at the close of all the evidence, defendants filed a motion for judgment of acquittal, again asserting that the government had failed to establish that the funds at issue were property of the United States. (JA 302, 315.)The district court denied these motions as well.

The jury convicted Hall of conspiracy to commit money laundering,[4] theft of government property, and money laundering,[5] and Reeder of aiding and abetting money laundering. On appeal, defendants assert that the district court erred in denying the motion to dismiss the indictment on the ground that the funds in question did not belong to the government. In addition, defendants contend that the government did not present sufficient evidence to establish the necessary elements of theft. Finally, defendants request that the Court allow them to preserve the right to challenge their sentences under *United States v. Santos*, 461 F.3d 886 (7th Cir. 2006), should the Supreme Court uphold the Seventh Circuit's ruling.

---

[4] 18 U.S.C. § 371: Conspiracy to commit offense or defraud the United States.

[5] 18 U.S.C. § 1956(a)(1)(B)(i), laundering of monetary instruments.

## II.    MOTION TO DISMISS INDICTMENT

**A.      Standard of review**

The facts in this case are undisputed. Accordingly, we review the trial court's denial of defendants' motion to dismiss *de novo*. *United States v. Klingler*, 61 F.3d 1234, 1237 (6th Cir. 1993).

Defendants assert that this court should only review the evidence that was presented to the trial court for consideration of the motion to dismiss. Defendants contend, however, that "[e]ven if the trial testimony . . . is considered, the result is the same." As defendants note, the same evidence of government control over the funds was presented to the district court before trial and to the jury that convicted defendants. Accordingly, this court does not find it necessary to distinguish between the pre-trial and trial evidence and motions.

**B.      Discussion**

To support a conviction of theft of government property in violation of 18 U.S.C. § 641, the government must establish that the defendant (1) knowingly (2) stole or converted to the use of another (3) something of value of the United States. *United States v. Forman*, 180 F.3d 766, 769 (6th Cir. 1999). The third element — that the funds belonged to the United States — is at issue here.

In *United States v. Klingler*, this court examined the cases applying 18 U.S.C. § 641 and discerned four types: (1) where the stolen property clearly belongs to the government and federal jurisdiction is undisputed; (2) where the federal government, or one of its agents, acts as a custodian or bailee of property, so that the transitory possession makes it the property of the United States; (3) where property that originated with the federal government passes to private hands, but the government retains sufficient control so that the funds remain federal property; and (4) where a government employee or agent has received property but fails to convey it to the United States and the question is whether the funds acquired the status of government property. *Klingler*, 61 F.3d at 1238. The instant case is the third type; the issue is whether the government

retained sufficient control over the funds involved. *Klingler*, which involved payments received by a government-licensed customs agent, was a type 4 case.

The government established that a certain percentage of the funds in AIMSI's bank account were derived from the receipt of interim reimbursements from the government. At issue, then, is whether the government retained sufficient control over the interim reimbursements that the funds remained government property for the purpose of Section 641.

In *United States v. Foulks*, 905 F.2d 928 (6th Cir. 1990), this court affirmed the conviction of a Salvation Army director who misappropriated checks drawn on a special emergency relief account. The relief funding came from the Federal Emergency Management Agency (FEMA), which disbursed money to local relief agencies for their food and shelter programs. *Foulks,* 905 F.2d at 929. After receiving funds from FEMA, the Salvation Army was required to report back to the federal agency, and any unused funds or misused funds were to be returned to the federal agency. *Id* at 930. This court explained that "[w]here the government retains power over grant funds, those funds retain their federal character even though deposited into accounts of non-federal agencies." *Id.*, *citing Hayle v. United States,* 815 F.2d 879 (2d Cir. 1987); *United States v. Wheadon*, 794 F.2d 1277 (7th Cir. 1986).

Other circuits have identified indicia of government control similar to those identified in *Foulks*. In *United States v. McKay*, 274 F.3d 755 (2d Cir. 2001), the money at issue originated with the United States Department of Housing and Urban Development (HUD) and was transferred to the Huntington Housing Committee (HHA), a local agency acting as a middleman between HUD and the landlords who eventually received Section 8 checks. McKay was convicted of embezzling $29,285 in federal funds from HHA, and, on appeal, asserted that the funds he embezzled were not government property. The Second Circuit examined the relationship between HUD and HHA to determine whether the government "exercise[d] supervision and control over the funds and their ultimate use." *Id.* at 758, *quoting Hayle*, 815 F.2d at 882. The Second Circuit found that the funds retained their federal character for two reasons. First, HUD

required HHA to comply with its regulations when administering the Section 8 program (for example, HHA was only permitted to subsidize the rent of tenants who fell within HUD's income guidelines). *McKay,* 274 F.3d at 758. Second, HUD's regulations also placed restrictions on landlords receiving Section 8 money through HHA, and all contracts between landlords and HHA required that landlords comply with the federal regulations as a condition of receiving Section 8 funding. *Id*. at 759.

A Ninth Circuit case, *United States v. Johnson*, 596 F.2d 842 (9th Cir. 1979), dealt with facts similar to those presented here. *Johnson* involved grants provided by HUD to the San Francisco Redevelopment Agency. The agency then contracted with a local union using the grants received from HUD to pay the union. *Id*. at 844. Johnson was an officer of the union and charged the agency thousands of dollars in fraudulent salaries for two fictitious employees. *Id*. The Ninth Circuit found that the government retained "supervision and control" over the funds advanced to the agency because federal regulations required the agency to maintain detailed financial records, file annual financial and progress reports, and adopt government-prescribed financial management systems. *Id*. at 845. The agency's contracts with the union required the union to allow HUD representatives access to the union's financial records, reports, work schedules, files and other materials maintained by the union, and made clear that the funds the union would receive from the agency originated with HUD, and that such funds had to be disbursed in accordance with the agency's contract with the United States and applicable legislation. *Id.*

Finally, in *United States v. Littriello*, 866 F.2d 713 (4th Cir. 1989), the defendants were convicted of embezzling $1.2 million from the American Postal Workers Union Health Plan. On appeal, the defendants contended that the money was not property of the federal government. The Fourth Circuit found that federal regulations imposed sufficient federal control over the health plan to render the funds government property. The federal regulations required the health plan to establish a special reserve fund, invest and credit all interest to the fund, keep detailed records relating to the

financial status of the fund, furnish an annual accounting of its operations to the federal Office of Personnel Management (OPM), and submit to audits by OPM. *Id.* at 715-16.

In the instant case, as a condition of obtaining the subcontracts at issue, AIMSI was required to demonstrate that it had an accounting system in place that could adequately track its projects and segregate its costs. (JA 1029.) AIMSI's Deltek accounting software satisfied these requirements, as it allowed AIMSI to track every cost it incurred, as well as record the amount of interim reimbursements it received. Each month, AIMSI's accountant provided Hall with a monthly summary comparing the interim reimbursements received with actual indirect costs incurred. Thus, while AIMSI was not required to segregate the interim reimbursements it received from its other funds by maintaining separate bank accounts, its accounting system tracked the interim reimbursements with such precision that it was as if the funds were segregated.[6]

Each of the subcontracts included: (1) a term requiring that AIMSI acknowledge that it was being reimbursed by the prime contractor with funds advanced from the Department of Energy; (2) a term requiring that interim reimbursement funds be used only for costs that were reasonable, allocable and actually incurred, in accordance with 48 C.F.R. §§ 31.201 *et seq.*; (3) a term stating that AIMSI's final indirect cost rates were governed by 48 C.F.R. §§ 47.000 *et seq.*; (4) a term requiring that AIMSI be subject to records inspection and audit by the United States Comptroller General and the Department of Energy related to any transaction arising from the subcontract; and (5) a term requiring that AIMSI return to the Department of Energy any interim reimbursements advanced, but not incurred, for overhead costs. Hall personally executed each of the subcontracts at issue. (JA 418-23, 1541-1567.)

We conclude that the government retained a degree of control over the interim reimbursement funds such that they remained property of the United States. The mechanisms of government control over the interim reimbursements in this case and the

---

[6]Alice Peterson testified that had AIMSI not used this sophisticated accounting software, it would have had to "set up a separate bank account for each individual contract and operate each individual contract separately as it if was its own stand-alone contract." (JA 1573-74.)

limits on their use are similar to those that this circuit and others have found sufficient to demonstrate retention of government control for the purposes of Section 641. Importantly, AIMSI was required to track the interim reimbursements it received and return any funds for costs it did not incur. As the Fourth Circuit stated in *Littriello*, "broad direction does not equate to no direction," 88 F.2d at 716, and defendants' argument that the government *could* have imposed more restrictions and control over the interim reimbursements by requiring separate bank accounts or conducting more frequent audits is without merit. The government's failure to take the measures suggested by defendants does not demonstrate that it had relinquished its control over the funds at issue. Rather, the terms of the subcontract make it clear that the government retained control over the interim reimbursements after it advanced them to AIMSI.

### III.     SUFFICIENCY OF EVIDENCE

### A.     Standard of review

Defendants also contend that the government did not prove the elements necessary to establish theft. A challenge to the sufficiency of evidence requires the Court to view the evidence presented at trial in a light most favorable to the prosecution, and determine whether any rational juror could have found that defendant committed all elements of the offense. *Jackson v. Virginia*, 443, U.S. 307, 319 (1979). This Court may reverse the jury's verdict only if it finds that the judgment is not supported by substantial and competent evidence, whether direct or wholly circumstantial, upon the record as a whole. *United States v. Barnett*, 393 F.3d 516 (6th Cir. 2005).

### B.     Discussion

Section 641 is the federal codification of "the common law crime of larceny." *United States v. Barlow*, 470 F.2d 1245, 1251 (D.C. Cir. 1972). To establish this crime, the government is required to establish a wrongful taking and carrying away of property with the fraudulent intent to deprive the owner of his property without his consent. *Id*.

At trial, the government presented evidence related to the theft committed by Hall which included the following:

- On September 29, 2000, Biosterile provided AIMSI with a fraudulent invoice for $37,500. (JA 364.)

- An AIMSI accounts payable voucher dated September 30 authorized payment to Biosterile for $37,465.00.[7] The voucher booked the expense to AIMSI's overhead account. (JA 366, 1414.)

- On November 10, 2000, AIMSI wrote and mailed a check to Biosterile for $37,500. (JA 373.) 26.9% of the $37,500, or $10,078.50, was derived from interim reimbursements advanced by the government, according to the government's expert. (JA 1589.)

- On November 13, 2000, Biosterile deposited the $37,500 check from AIMSI into its bank account. (JA 375.)

- Also on November 13, Biosterile wrote a check to Pitstyle Kennels, LLC[8] for $20,000. (JA 381 and 389.) The Pitstyle check was endorsed by Hall and deposited into the Pitstyle bank account on November 14. (JA 389.) Proceeds from AIMSI's $37,500 check to Biosterile were used to fund Biosterile's $20,000 check to Pitstyle.[9] (JA 1516-21.)

- The AIMSI check for $37,500 cleared the bank on November 14, 2000. (JA 1429.)

Defendants attach significance to the government's failure to establish that AIMSI's provisional reimbursement rate changed as a result of the fraudulent invoice. However, this was not the government's theory. Instead, the government claimed that

---

[7] The remaining $35 was authorized on a separate accounts payable voucher dated November 8, 2000.

[8] Pitstyle Kennels was owned and operated by Hall and his son, Kendrick Hall.

[9] Also on November 13, 2000, Biosterile wrote a check to the Oak Ridge Churchmen (ORC) for $9,600. The check was deposited into ORC's bank account the same day. (JA 363.) The Oak Ridge Churchmen check was endorsed by Lance Copeland, a UT-Battelle procurement official with oversight on AIMSI's sub-contracts. (JA 1930.) The government's theory was that this money was later given to Reeder in cash.

Biosterile's deposit of the $37,500 AIMSI check as payment on the fraudulent invoice resulted in the unlawful appropriation of interim reimbursement funds from the interim account.

In addition, the government presented evidence demonstrating that at the close of the fiscal year, Hall was aware that AIMSI's actual overhead expenses were less than the interim reimbursements AIMSI had received from the government, and that on September 30, the last day of the fiscal year, Hall authorized a $37,500 payment to Biosterile for fictitious work, and booked this expense to AIMSI's government reimbursement overhead account. When Biosterile deposited the fraudulent check — a portion of which was derived from interim reimbursements — the theft of government property was complete. The evidence presented at trial was sufficient for a rational juror to find that all elements of Section 641 were established.

## IV.    SENTENCE

Defendants' final issue asks "[w]hether it was error to sentence the defendants based upon the gross receipts rather than the net proceeds of any illegal activity." At the time defendants filed their appeal brief, the Supreme Court had granted certiorari in *United States v. Santos*, 461 F.3d 886 (7th Cir. 2006),[10] and defendants requested that this court enter an order preserving their right to challenge their sentences in the event that the Supreme Court upheld *Santos*. In June 2008, the Supreme Court affirmed the Seventh Circuit, and held that the term "proceeds" as used in 18 U.S.C. § 1956 refers to "profits," not "receipts" of an illegal enterprise. *United States v. Santos*, 128 S.Ct. 2020, 2031 (2008). Defendants assert that the Sixth Circuit case of *United States v. Haun*, 90 F.3d 1096 (6th Cir.1996), *cert. denied*, 519 U.S. 1059 (1997) is in direct conflict with *Santos,* and ask this court to overrule *Haun* and remand the case for re-sentencing.[11]

---

[10]In *Santos*, the Seventh Circuit upheld a prior case, *United States v. Scialabba*, 282 F.3d 475, (7th Cir. 2002), where the court held that when the only transactions supporting a money-laundering conviction are payment of an illegal enterprise's operating expenses out of its gross income, a conviction for money laundering cannot stand.

[11]Defendants alternatively requested that we "enter an order preserving this issue which will allow the defendants to challenge their sentence [sic] if *Santos* is affirmed by the United States Supreme Court." Because *Santos* has in fact been affirmed we need not address this alternative request for relief.

Both *Santos* and *Haun* addressed the question whether the defendant's conduct constituted a violation of 18 U.S.C. § 1956 (a)(1)(A). In *Santos*, the defendant operated an illegal gambling operation from the 1970s through the 1990s, and as part of that operation, used gambling receipts to pay his employees and to pay winnings to the gamblers. *Santos*, 128 S.Ct. at 2022. The Supreme Court held that Santos' mere payment of his operating expenses did not constitute money laundering, stating that "transactions that normally occur during the course of running a lottery are not identifiable uses of profits and thus do not violate the money-laundering statute." *Id.* at 2027. While some broad language in *Hahn* may be read as being inconsistent with *Santos*, the issue presented in *Santos* was not directly before the court in *Hahn*.

In any event, defendants here do not rely on *Santos* for the proposition there established – that transactions involved in the normal course of running the illegal operation do not constitute transactions involving criminal proceeds in violation of the money-laundering statute. Rather, they argue that the district court erred in sentencing them based upon the gross receipts, not the net proceeds, of the illegal activity.

We observe that this argument was not made below, and defendants provide no factual support for their position on appeal. Defendants themselves acknowledge that "the record of the sentencing hearing does not make it clear whether or not the difference in considering gross proceeds as opposed to net proceeds would have affected defendants' sentences." "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2000). Under these circumstances, defendants have failed to properly develop the issue and have not preserved it for our review.

## V.   CONCLUSION

The government retained sufficient control over the funds at issue to support a conviction of theft of government property. Further, the government presented sufficient evidence from which a rational juror could conclude that all elements of theft were established. We **AFFIRM** defendants' convictions and sentences.