RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON L. OSBORNE,

*Defendant-Appellant.*

No. 16-6760

─────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:13-cr-00125-3—Kevin H. Sharp, District Judge.

Argued: December 6, 2017

Decided and Filed: March 29, 2018

Before: CLAY, GIBBONS, and BUSH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Andrew C. Brandon, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. John P. Taddei, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Andrew C. Brandon, Ronald C. Small, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Stephanie N. Toussaint, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────

## OPINION

─────────────

CLAY, Circuit Judge. Defendant Aaron Osborne ("Osborne") appeals from the judgment of conviction and sentence entered by the district court for aiding and abetting the theft

of government money in violation of 18 U.S.C. § 641 and 18 U.S.C. § 2. For the reasons set forth below, we **REVERSE** Osborne's conviction and **VACATE** his sentence.

## BACKGROUND

This case arises out of the Guard Recruiting Assistance Program ("G-RAP"), a civilian-run program designed to increase recruiting to the Air National Guard ("ANG") during the "War on Terror." The program was intended to incentivize airmen, officers, and retirees to serve as Recruiting Assistants ("RAs"). The program was run by Document and Packaging Brokers, Inc. ("Docupak"), a private corporation. Docupak was responsible for selecting RAs from the pool of applicants and training them. The RAs were to reach out into their communities to find potential future airmen, and then direct those potential airmen to full-time recruiters, who would sign up the new recruits. The program provided a monetary incentive to the RAs to sign up people to the ANG and encourage them to complete the training process. The RAs would receive a $1,000 pre-loaded Visa gift card upon actual enlistment of the potential airman and an additional $1,000 upon the airman's completion of basic training. The government argues that a central rule of the G-RAP program was that the RAs were required to "identify individuals that were not already working with a full time ANG Recruiter" and that the RAs were prohibited from splitting the G-RAP payment with full-time recruiters. (R. 1, Indictment, PageID at # 1–2.) This rule gave rise to the criminal charges against Osborne and his co-defendants.

Osborne was a full-time recruiter for the ANG. He was accused of working with two RAs, Arvalon Michelle Harleston ("Harleston") and Max P. Andolsek ("Andolsek"), to share in the cash incentives offered by the program. Essentially, Osborne was accused of referring names of pre-existing recruits to Harleston and Andolsek so that they could claim the recruiting incentive. Harleston and Andolsek would then pay kickbacks to Osborne. Osborne, Andolsek, and Harleston were charged in a seven-count indictment. Relevant for this appeal is Count Four, which alleged that Osborne aided and abetted Andolsek in embezzling, stealing, purloining, or converting "money or a thing of value greater than $1,000 from the United States Department of Defense" in violation of 18 U.S.C. § 641 and 18 U.S.C. § 2. (*Id*. at # 11.) Specifically, the indictment alleged that Andolsek, aided and abetted by Osborne, represented that approximately 18 potential airmen had been recruited by Andolsek in compliance with G-RAP rules, when they

really had not been, which "caused the United States Department of the Defense to reimburse Docupak for approximately $9,000 in payments it made to him under the G-RAP." (*Id*. at 11–12.)  Andolsek pleaded guilty prior to trial and testified against Osborne at trial.

At the close of the government's case-in-chief and again at the close of all the evidence, Osborne moved for a judgment of acquittal.  He argued that the theft of the funds was not a prosecutable offense because the funds were stolen from a private contractor, and not a governmental agency, and because in doing so Defendants only violated Docupak's internal policy, and not a federal rule or regulation.  The district court denied both motions.  The jury convicted Osborne on the one count of aiding and abetting Andolsek in the theft of government funds (Count 4) and acquitted him on the remaining six counts.  The jury acquitted Harleston on all counts.

On October 5, 2015, Osborne filed a post-trial motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c).  In his motion, he argued that the verdict should be set aside because:  "(1) the government failed to produce evidence sufficient to allow a reasonable jury to conclude that the allegedly stolen funds were 'government property'; and (2) the jury's verdicts finding that Mr. Osborne did *not* conspire with Mr. Andolsek to steal from the government or to make false claims to the government are entirely inconsistent with their verdict finding that Mr. Osborne *did* aid and abet Mr. Andolsek in a 'theft' of government property." (R. 136, Mot. for J. of Acquittal, PageID # 922.)

On April 5, 2016, the district court denied Osborne's motion.  With regard to the first claim, the district court found that "a reasonable jury could have found that the finder fees paid in this case were a 'thing of value' to the United States." *United States v. Osborne*, 180 F. Supp. 3d 507, 513 (M.D. Tenn. 2016).  The district court reasoned that "the Department of Defense created the G-RAP program and Docupak executed it," "Docupak received federal funds to run the G-RAP program," "the Government placed restrictions on how G-RAP funds could be used," and "Docupak was required to submit monthly, quarterly and annual reports to the Department of Defense, and agreed to comply with other mandatory reporting requirements as mandated by the Secretary of the Army and his designee." *Id*. at 513–14.  With regard to the second claim, the district court found that the verdicts were not mutually exclusive.

The district court sentenced Osborne to time served, two years supervised release, a $10,000 fine, and $9,000 in restitution. Judgment was entered against Osborne on December 5, 2016.

Osborne timely filed a notice of appeal that same day. On appeal, he argues that there is insufficient evidence to sustain his conviction for theft of government property because the government failed to prove that the money involved was "government property" or that it was "stolen."

## DISCUSSION

## I. MONEY OF THE UNITED STATES

### Standard of Review

This Court reviews a district court's denial of a motion for judgment of acquittal *de novo*. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). When considering a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "All reasonable inferences and resolutions of credibility are made in the jury's favor." *United States v. Tragas*, 727 F.3d 610, 617 (6th Cir. 2013) (quoting *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012)). "We may not 'weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury.'" *Graham*, 622 F.3d at 448 (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999)).

Courts have treated the ultimate question of whether something is government property as a legal question for a court to review *de novo*. *See United States v. Foulks*, 905 F.2d 928, 929–30 (6th Cir. 1990); *United States v. McKay*, 274 F.3d 755, 759 (2d Cir. 2001); *United States v. Littriello*, 866 F.2d 713, 716 (4th Cir. 1989); *United States v. Long*, 996 F.2d 731, 732 (5th Cir. 1993) ("When the question of ownership of property depends upon the construction or existence of a statute, it is a matter of law for the court's determination, and therefore subject to

*de novo* review.") (reversed on other grounds). Again, while we answer this question *de novo*, we view the evidence in the light most favorable to the government and draw all reasonable inferences in favor of the jury.

**Analysis**

Under 18 U.S.C. § 641:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . [s]hall be fined under this title or imprisoned . . . .

Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

In order to convict someone of theft of government property under § 641, the government must prove that a defendant: "(1) knowingly (2) stole or converted to the use of another (3) something of value of the United States." *United States v. Forman*, 180 F.3d 766, 769 (6th Cir. 1999) (citation omitted). In order to convict someone of aiding and abetting under § 2, the government must show: "(1) an act by a defendant that contributes to the commission of a crime; and (2) the intent to aid in the commission of the crime." *United States v. Gardner*, 488 F.3d 700, 714 (6th Cir. 2007) (citation omitted).

In this case, at issue is whether the funds belonged to the United States, i.e., were "something of value" to the United States. This Court has observed that prior case law "discern[s] four types" of violations under § 641:

> (1) where the stolen property clearly belongs to the government and federal jurisdiction is undisputed; (2) where the federal government, or one of its agents, acts as a custodian or bailee of property, so that the transitory possession makes it the property of the United States; (3) where property that originated with the federal government passes to private hands, but the government retains sufficient control so that the funds remain federal property; and (4) where a government employee or agent has received property but fails to convey it to the United States and the question is whether the funds acquired the status of government property.

*United States v. Hall*, 549 F.3d 1033, 1038 (6th Cir. 2008) (citing *United States v. Klingler*, 61 F.3d 1234, 1238 (6th Cir. 1995)). Because Osborne technically received the money from a private entity, this case falls under the third category.

We therefore ask whether the government retained sufficient supervision and control over the funds involved such that the funds retained their federal character. *See Hall*, 549 F.3d at 1038 ("[T]he issue is whether the government retained sufficient control over the funds involved."); *United States v. Barger*, 923 F.2d 855, at *9 (6th Cir. 1991) (asking whether the government retained sufficient "supervision and control" over the property); *Littriello*, 866 F.2d at 715 (looking for "evidence of federal control and supervision" over the funds in question"); *United States v. Wheadon*, 794 F.2d 1277, 1284 (7th Cir. 1986) ("[W]e look to see whether the federal government still maintained supervision and control over the funds at the point when the funds were converted."); *United States v. Johnson*, 596 F.2d 842, 845 (9th Cir. 1979) (looking for "proof of the supervision and control exercised by the government over the funds and their ultimate use"). To answer this question, courts engage in a fact intensive inquiry, looking for indicia of government supervision and control. *See Hall*, 549 F.3d at 1038; *Barger*, 923 F.2d at *9; *Foulks*, 905 F.2d at 930.

For example, in *Hall*, a private entity was awarded several cost-reimbursement subcontracts by a prime contractor funded entirely by the U.S. government. 549 F.3d at 1035. Under the terms of the subcontracts, the entity was reimbursed by the government in the form of a biweekly advance or "interim reimbursement." *Id.* In the event that the government overpaid, the entity was required to return the extra money to the government. *Id.* Instead, Hall authorized payment for fictitious work so that he could keep all of the money from the government. *Id.* at 1036. We found sufficient control where, as a condition of obtaining the subcontracts, the entity was "required to demonstrate that it had an accounting system in place that could adequately track its projects and segregate its costs," and its accounting software did in fact satisfy those requirements. *Id.* at 1039. Additionally, each subcontract contained certain terms including:

> (1) a term requiring that [the private entity] acknowledge that it was being reimbursed by the prime contractor with funds advanced from the Department of Energy; (2) a term requiring that interim reimbursement funds be used only for costs that were reasonable, allocable and actually incurred, in accordance with

[specific federal regulations]; (3) a term stating that [the private entity's] final indirect cost rates were governed by [specific federal regulations] (4) a term requiring that [the private entity] be subject to records inspection and audit by the United States Comptroller General and the Department of Energy related to any transaction arising from the subcontract; and (5) a term requiring that [the private entity] return to the Department of Energy any interim reimbursements advanced, but not incurred, for overhead costs. Hall personally executed each of the subcontracts at issue.

*Id*. at 1040. We said "[i]mportantly, [the subcontractor] was required to track the interim reimbursements it received and return any funds for costs it did not incur." *Id*. Because of "[t]he mechanisms of government control over the interim reimbursements . . . and the limits on their use," we found that the government had retained "a degree of control over the interim reimbursement funds such that they remained property of the United States." *Id*.

In *Foulks*, a Salvation Army director misappropriated checks drawn on a special emergency relief account, the funding for which came from the Federal Emergency Management Agency ("FEMA"). 905 F.2d at 929. FEMA "placed limits upon how the money could be spent, required certain record keeping and accounting procedures, and retained a reversionary interest in the funds." *Id*. One of those limitations was that funds could be spent only for "procurement costs," meaning employees or volunteers could not receive "any kind of benefit from the agencies' allotment." *Id*. We found that the funds retained their federal character even though they were in Salvation Army accounts because FEMA "limited or controlled the use of these funds in that the Salvation Army was required to report back to the federal agency, and any unused funds or misused funds were to be returned to the federal agency." *Id*. at 930.

Other circuits similarly engage in a fact-bound inquiry, looking to whether the government maintained sufficient supervision and control over the funds. For example, in *McKay*, a housing authority received money from the U.S. Department of Housing and Development ("HUD") and was to act as a middleman between HUD and the landlords who received Section 8 checks. 274 F.3d at 756. The nephew of the chairman of the housing authority was convicted of embezzling funds after he fraudulently received funds for an apartment that he did not own. *Id*. at 756–57. The Second Circuit found that the funds retained their federal character because "[c]ontrol was exercised [by HUD] at two levels": (1) HUD

placed restrictions on the housing authority for administering the Section 8 program; and, (2) HUD placed restrictions on the landlords receiving Section 8 money from the authority. *Id.* at 758–59. HUD's restrictions on the housing authority included requiring that the authority use the funds only to subsidize the rent of tenants who fell within HUD's income guidelines and prohibiting the authority from giving money to landlords who occupied a "policy-making position" within the authority. *Id.* HUD's restrictions on the landlords included that the landlords comply with HUD regulations as a condition of receiving the funding, that the amount of rent be an amount determined by the authority in accordance with HUD regulations, that the rent be adjusted based on an annual HUD publication, and that the landlord provide HUD with "reasonable information pertinent to the contract" and "permit HUD to have access to the premises and the ability to access business records to determine compliance with the contract." *Id.* at 759. Consequently, the Second Circuit found that "HUD continued to exercise substantial control over the funds and their ultimate use." *Id.*

In *Littriello*, the defendants were convicted of embezzling from a health insurance plan operated by the American Postal Workers Union Health Plan under contract with the Office of Personnel Management ("OPM"). 866 F.2d at 713. The contract stated that premiums were to be paid by the government. *Id.* The contract required that all funds given to the Plan by OPM, but not paid out in premiums, be invested. *Id.* at 713–14. The defendants invested the money in high-risk/high-interest investments, recorded the investments as low-interest, and then kept the difference between the actual and listed interest amounts. *Id.* at 714. The Fourth Circuit cited to a number of facts to conclude that the government introduced "substantial evidence of federal control and supervision," including requirements that: (1) the Plan establish a Special Reserve Fund separate from other plans; (2) the funds be invested and all interest credited to the fund; (3) the funds be returned to the government should the contract be terminated pursuant to specific regulations; (4) the Plan maximize investment "with due considerations to the safety and liquidity of investments" pursuant to specific regulations; (5) if the Plan failed to invest the money, OPM could direct the "carrier" to credit the fund for the income that would have been earned if the plan had complied with regulations at a rate determined by statute; (6) the Plan keep detailed financial records; (7) the Plan furnish an annual accounting of its operations to OPM; (7) the Plan furnish, upon OPM's request, financial reports; and, (8) the Plan submit to audits by

OPM and a yearly audit by a CPA firm. *Id*. at 715. A number of these requirements were imposed pursuant to federal regulations. *Id*. The Fourth Circuit found that the regulations, contract provisions, and retained reversionary interest indicated that the government had sufficient supervision and control over the funds. *Id*. at 717.

In *Wheadon*, a housing authority received money from HUD to implement housing projects. 794 F.2d at 1279. The executive director of the authority was part of a kick-back scheme involving a building company that sought contracts with and false reimbursements from the authority. *Id*. at 1279–80. The Seventh Circuit found that HUD maintained sufficient supervision and control over the funds. *Id*. at 1284–85. It noted that "HUD retained control through: quarterly reports; HUD's access to all Housing Authority records; the Housing Authority's responsibility to maintain and keep accurate records; HUD's right to terminate any contract; HUD's right to cut off funding and to approve any and all disbursements; HUD's right of prior approval on all contracts, proposals, and appropriations; and HUD's right to conduct on-site inspections." *Id*. at 1284–85. HUD did not retain a reversionary right to the funds, but the court found that "such evidence is just one type of evidence, albeit a particularly compelling one, that the government can use to prove that it maintained supervision and control." *Id*. at 1285.

In *Johnson*, a public redevelopment agency received grants from HUD and then contracted with a union for certain services using the funds from HUD. 596 F.2d at 843–44. The defendant was an officer of the Union who charged HUD thousands of dollars for the salaries of two fictitious employees. *Id*. at 844. The Ninth Circuit found that the government retained "substantial supervision and control over the funds." *Id*. It cited the following facts in support of its conclusion: (1) federal regulations required the Agency to "maintain detailed financial records, file annual financial and progress reports, and adopt government-prescribed financial management systems"; (2) federal regulations required the Agency to return interest earned on funds to the federal government; (3) regulations required the Agency to record the receipt and expenditure of revenues; (4) federal regulations allowed funds not required to be retained, but mandated they be applied to other projects pursuant to specified regulations; and (5) the contracts required that HUD have access "at all reasonable times" to records, reports, work schedules, and any other materials that pertained to services under the contract. *Id*. at 844–

45. The Ninth Circuit found that, clearly, the government funds "were deposited in trust with the agency to be held and disbursed in accordance with the terms, conditions, and provisions of the above mentioned legislation and regulations." *Id*. at 845. The Court found it important that the agency was required to "use all excess funds for purposes contemplated by the legislation and regulations." *Id*.

The cases from inside and outside of this Circuit suggest that courts address a number of factors when considering the nature of funds that have been transferred to a private party by the federal government. These include:

(1) Did the government retain a reversionary interest in the funds?
(2) Did the government place restrictions on how the funds are used, spent, or maintained?
(3) Did the government impose internal controls like record keeping requirements, audit requirements, accounting procedures, or reporting requirements?
(4) Did the government require that it have the right to inspect or access the private entity's records or perform audits?
(5) Are the funds governed by federal regulations or statute?
(6) Did the government retain the right to terminate the contract or cut off funding to the private entity?
(7) When there is a contract between the private entity receiving the federal funds and a third party receiving funds from the private entity, did the contract have a federal character or subject the third party to federal restrictions?

While courts have consulted a number of different factors, they have not explicitly indicated the relative importance or weight of the various factors. However, it seems this Circuit has placed an emphasis on the first three factors.[1]

On appeal, Osborne argues that the government failed to prove that the money involved in this case was "government property" because it did not prove that the government retained sufficient control over the money. He argues that even if Andolsek "stole" money, it was from Docupak and not the government, because the money had passed out of the hands of the

---

[1]*See Hall*, 549 F.3d at 1040 ("Importantly, [the private entity] was required to track the interim reimbursements it received and return any funds for costs it did not incur."); *Foulks*, 905 F.2d at 929 (highlighting that the funds retained their federal character because the government "limited or controlled the use of these funds in that the [private entity] was required to report back to the federal agency, and any unused funds or misused funds were to be returned to the federal agency").

government to Docupak before the alleged theft and the government did not retain sufficient control over the funds involved. He argues that there were no regulations governing the G-RAP program, there was no documentation of a government rule against the conduct that occurred in this case, and that Docupak would retain its fees and pay the RAs their funds for any recruit even if they were recruited in violation of the Docupak rules. The government, on the other hand, argues that the evidence was sufficient to support the conviction. It argues that the funds in question were money "of the United States or any department or agency thereof" because the government exercised sufficient control over the funds inasmuch as the program was created by the DOD, funded with federal money, and subject to federal restrictions and oversight, even though it was administered by a third-party contractor.

Briefly, we note that the government did not produce the actual contract governing the relationship between the ANG and Docupak for the relevant time period involved (2006). All the government had was an unexecuted copy of a draft task order[2] from 2007.[3] However, Docupak's president, Phillip Crane, testified that the unsigned version from a different year was "representative of what a typical contract . . . or task order would look like." (R. 200, Trial Tr., PageID # 1484.) We also note that the government did not produce any documentation that the government reimbursed Docupak for the specific funds whose theft Osborne was convicted of aiding and abetting. However, several witnesses testified that the government reimbursed Docupak for the payments at issue. For example, Crane testified that Docupak "would invoice and be reimbursed by the government" after sending out the payment to the RA who was given credit for the recruit. (*Id*. at # 1501.) To claim reimbursement from the government, Crane testified that Docupak would submit a Form 250. Again, however, the Docupak representatives testified that they had none of the Form 250 invoices for any of the defendants in the case.

---

[2]Docupak representatives testified that the G-RAP program was created as a "task order" between Docupak and the ANG. The task order was essentially a contract that the parties entered into and that was renewed annually for the years the G-RAP program ran.

[3]The government initially tried to introduce the 2007 unsigned task order into evidence, but the defense objected because it was not the actual binding agreement. Docupak's president also testified that Docupak likely still had a version of the original contract, which the prosecutor said was not produced to the government. The district court did not permit the task order to be admitted into evidence when it was first offered by the government. Later, however, the defense for Harleston entered the task order into evidence in order to contradict what government witnesses had said about the task order.

It seems to us that the prosecution made the most unremarkable attempt to prove its case, relying on general testimony from Docupak instead of finding and producing specific evidence. However, "the testimony of a single witness is sufficient to support a conviction," *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012), and "circumstantial evidence alone can sustain a guilty verdict," *United States v. Stone*, 748 F.2d 361, 362 (6th Cir. 1984). Consequently, even though the government should have introduced the actual contract and evidence of reimbursement, because the jury did hear testimony about both, the jury could have concluded that the task order evidenced the terms of the actual agreement between the parties and that Docupak invoiced and was reimbursed for the payments at issue in this case.

Thus, the question for us is whether the facts established the requisite degree of governmental supervision and control over the funds so that the funds retained their federal character. With an eye to the factors referenced above, we will review the relevant evidence adduced at trial, which includes an unexecuted "task order" between Docupak and the ANG, a "representation" of the G-RAP website created by Docupak, Docupak's online training materials and online quiz, and the testimony of Docupak's president (Phillip Crane), the Docupak program manager in charge of the G-RAP program (William Stewart), and some other Docupak employees.

First, the government did not retain a reversionary interest in the funds. For instance, there was no evidence indicating that Docupak was required to return any unused or misused funds. Crane testified that "the only written terms that [defined] the G-RAP program [were] in the contracts that [they] entered," and there were no "other side agreements with the Air National Guard in writing." (R. 202, Trial Tr., PageID # 1686–87.) There were no other sources from the government that contained terms regarding the G-RAP program. The task order did not require the return of misused or unused funds. Additionally, Crane testified that in the event an RA broke some training protocol in recruiting potential airman, Docupak would keep its $345 fee from the government. Further, there is evidence that Docupak knew that the RAs in this case falsely claimed to have been the first contact for some potential airmen, but that they paid the RAs anyway.

Next, the evidence shows that the government placed few restrictions on the funds. The district court relied on the fact that the task order sets out the contours of the G-RAP program, including information about the goals and scope of the program, the players involved, and the role Docupak was to play in administering the program. However, those things do not demonstrate that the government exercised supervision or control over the funds. Instead, the task order would appear to describe every situation in which the government gives money to a private entity in order for it to carry out certain goals and objectives. Generally providing the details of a program does limit the private entity, but it is not the same thing as placing limits on the funds themselves.

While the restrictions placed on Docupak funds generally were minimal, the government argues that additional restrictions were placed on the RA-reimbursement funds. Specifically, the government cites to the rule restricting RAs from splitting fees with recruiters and the line-item in the task order providing funds specifically for "payments to the recruiting assistant." (Def. Ex. 1 at 2.)

However, the fee-splitting rule does not appear to be a government mandated rule, but instead a rule imposed by Docupak. Docupak's training materials stated that RAs should not split money with recruiters. The materials provided that "[t]his is theft and cause for immediate termination and civilian criminal prosecution for you as a civilian. The Recruiter will face possible separation from service and prosecution under state militia laws." (Gov't Ex. 1, Website, 18.) Crane and Stewart initially testified that these rules were included in "one of the guidelines that was set forth by the government in [the] base contract." (R 200, Trial Tr., PageID # 1498; R. 202, Trial Tr., PageID # 1795.) However, they both later admitted that the task order did not actually contain any of those rules. And the task order did not include any of these rules or any similar language—the document was silent on the fee-splitting issue. The rules published on the website were merely Docupak's "interpretations of [the] contract." (*Id.* at # 1720.) Furthermore, Crane could not say when the fee-splitting rule contained in the training materials would have gone into effect. Nor did he know whether it was included in the original 2006 training materials or added later.

Even assuming that the fee-splitting rule was imposed at the behest of the government, the government retained no ability to enforce this rule, nor any ability to ensure that Docupak enforced this rule, and Docupak did not in fact enforce this rule. The relationship between the government, Docupak, and the RAs makes clear that this is not an instance of supervision and control "contemplated and manifested on the part of the government." *Long*, 996 F.2d at 732 (citation omitted). The government could have effectively restricted the distribution of these funds by requiring Docupak to give money only to RAs who had agreed to abide by this rule or by prohibiting Docupak from giving further money to those who violated the rule, or by creating a regulation directly prohibiting the splitting of money between RAs and recruiters. But the government did not do any of these things. At most, all the jury could have found was that the government, without imposing an enforcement mechanism, required Docupak to tell the RAs to not split fees with recruiters. This proof demonstrates no more than a minimal restriction on the money the government gave to Docupak.

The government did, however, exercise control over the stolen funds to the degree that it mandated that they be spent to pay for "the recruiting assistant[s], the contractor cost[s] of any kind associated with payment to the RA[s], and any premium payment adjustment premiums." (Def. Ex. 1 at 2) Requiring that the stolen funds be used for one of these purposes constitutes the exercise of some degree of supervision or control over those funds, s*ee Foulks*, 905 F.2d at 929, but not so much control as would have been exercised had the government mandated the specific amount to be paid to RAs or limited the expenditure of the funds to the payment of the RAs.

Third, there is some evidence that Docupak did maintain certain internal controls. For example, the task order stated as follows:

> "Docupak actively manages data for accuracy and validity as follows: [examples]" (Def. Ex. 1 at 20.)

> "Docupak has a system of internal controls to prevent inappropriate payment of funds. Our controls are strong and compliant. In addition, Account Executives conduct random quality assurance procedures to eliminate fraud, waste, and abuse. These controls include . . . [p]eriodic internal audits of payments[,] [v]alidation of RA status and eligibility for payment[,] [and] [v]erification of financial system integrity and security." (*Id.* at 20.)

"Docupak capitalizes on the GRAP database to manage and verify the disbursement of RA funds. . . . The GRAP financial database will be utilized to track and report on this task order." (*Id*. at 10.)

"Our approach focuses on four major elements . . . [including] processing the RA payments in an efficient manner with effective financial controls." (*Id*. at 9.)

Docupak also committed itself to "perform in accordance with the following Performance Requirements Summary." (*Id*. at 30.) Among these requirements were to "[e]xercise [f]iscal [r]esponsibility" and sufficiently update "task order performance records" "to ensure the most current information is accessible." (*Id*.) However, it is not clear that any of these were requirements or that they were imposed by the government.

The task order also included a section called "Deliverables." (*Id*. at 27–28.) This seems to provide that different budget and cost reports and summaries would be submitted at various times to the government. Among these documents are an annual budget summary, a quarterly budget report, and a semi-annual budget summary. Finally, the task order included a section regarding "Accounting for Contract Services." (*Id*. at 14.) It provides: "The Secretary of the Army has implemented Accounting for Contract Services. This initiative has been put in place to obtain better visibility of the contractor service workforce." (*Id*.) The task order further provided that "[t]hese contract reporting requirements are mandatory. By acceptance of this contract and performance under this contract, the contractor agrees to comply with these reporting requirements." (*Id*.)

Fourth, there is some evidence that Docupak would give the government access to information, but there is no evidence that the government retained the right to conduct audits. For example, the task order said "Our approach focuses on four major elements: . . . (3) providing NGB-ANG Recruiting and Retention leadership access to management reports and on-line charts to more effectively predict long-term plans." (*Id*. at 9.) It also said, "In addition to providing data relevant to managing the financial and performance of RAs [sic], we are able to provide important financial information to NGB-ANG Recruiting and Retention leadership that projects future contracts and payments in the G-RAP pipeline (i.e., run rates)." (*Id*. at 23.) Though the language does indicate that the government had some access to Docupak's information, it is not clear that the government had the *right* to access the information. The

language does not suggest that Docupak was required to provide this access or that the government imposed this requirement. Again, this is problematic inasmuch as the supervision and control should be "contemplated and manifested on the part of the government." *Long*, 996 F.2d at 732 (citation omitted).

Fifth, there were no federal regulations governing the G-RAP program. The basis for the government's relationship with Docupak was the task orders, not statute or regulation. There were no Air Force Instructions or Regulations promulgated regarding any of the "rules" for the G-RAP program. There were no statutes or regulations providing a punishment for any violations of the "rules." For instance, Docupak representatives acknowledged that there were no Air Force instructions or regulations providing punishment for fee splitting.

Sixth, the government may have retained the right to terminate the contract. However, there is nothing that explicitly reserved this right; under "Recommended Timeline," the task order says "Contractor should provide in the proposal a date this contact will take effect and continue until notified by NGB/AIR to terminate." (Def. Ex. 1 at 7.)

Finally, the agreement between Docupak and the RAs appeared largely extra-governmental. For instance, when individuals signed up to be an RA, they would apply online through a website created and maintained by Docupak. At trial, the government did not produce the website itself, but produced a "representation of the website." (R. 200, Trial Tr., PageID # 1488.) Apparently, this represents the training the RAs in this case would have received. The RAs would have endorsed their online application with an e-signature, but Docupak did not preserve these signatures. Docupak also had no documentation about when the RAs in this case completed training.

The online materials provided basic information about the program. This included information that the RAs would be "an independent contractor for Docupak," and would "not act[] in a military capacity." (Gov't Ex. 1, Website, at 9.) Under a section called "G-RAP and its relationship to the Air National Guard," the materials made clear that the G-RAP program and the ANG were separate. (*Id*. at 8–9.) For example, it said, "G-RAP is not a required program and has no bearing on your status in the Air Guard or you military career. You act as an

independent contractor for Docupak," "your performance as a Recruiting Assistant, whether successful or not, will not affect your career in the ANG," "Your actions in a G-RAP capacity are independent of your role as a member of the Air National Guard and have no impact on your military status," and "your actions in a G-RAP capacity are independent of your role as a member of the Air National Guard." (*Id*.)  It further said, "You are never allowed to represent yourself as an Airman/Officer working a paid military status, nor should you portray yourself as a member of the ANG Recruiting staff." (*Id*. at 28.)  It also provided information about who the RAs would take direction from ("The Recruiters or Docupak?") and said that "[a]s an independent contractor, direction will be given by Docupak.  Docupak will help guide you and provide the support you will need to be successful.  Any questions that arise should be directed to Docupak." (*Id*. at 9.)  Such issues included questions about problems with pay.  The RAs did not report to any kind of military chain of command.  Any problems raised by the RAs would have been addressed and handled by Docupak.  The task order stated in response to the question, "If I am a member of the Air National Guard, do I use the unit to answer questions or do I go to Docupak? Docupak is your first contact for questions.  If additional information is needed outside of Docupak, they will help facilitate securing the necessary information for you." (Gov't Ex. 1, Website, 9.)  The website also provided that RAs received 1099 tax forms from Docupak reporting their income.

These training materials stated that RAs were prohibited from fee splitting.  The website further provided that RAs should "report any such activity to Docupak." (*Id*.)  The website provided a number to call to report abuse of the program.  That number was a Docupak number, not a government number, and was manned by Docupak representatives, not government representatives.

In all, there is evidence that the government placed some limits on the expenditures of the funds, that Docupak had certain internal controls, that Docupak gave the government access to certain financial information, and that the government retained the right to terminate the contract.  But this is a substantially lower degree of supervision and control than existed in *Hall*, *Foulks*, and the other out-of-circuit cases.  And it was shown with substantially less evidence than provided in those cases, a point noted by the district court:

> [T]he evidence presented at trial was not what one would normally expect in a case alleging that stolen funds were Government property. The Government could have (and likely should have) submitted the actual signed contract that governed the relationship between Docupak and the Air National Guard. The introduction of a Couple of DD Form 250s would have been helpful as well.

*Osborne*, 180 F. Supp. 3d at 515.

Importantly, in this case, there is no evidence that the government retained a reversionary interest in the funds. There is no evidence that the program or the funds were governed by statute or regulation. There is no evidence that the government imposed a right to perform audits. There is little to no evidence suggesting that the agreements between Docupak and the RAs were of a governmental nature. These are significant deficiencies. The prosecution produced negligible evidence of government supervision or control, and the task order does little to help the government's case. Although failing to retain a reversionary interest alone may not be fatal, it does require showing a greater exercise of supervision or control via other means, and we do not think sufficient other indicia of those means are present. We hold that, on these facts, the government did not retain sufficient supervision and control over the funds such that the funds retained their federal character. Because we find insufficient indicia of government supervision and control over the funds, no reasonable jury could have found that the funds were something of value to the United States beyond a reasonable doubt. Thus, we hold the government failed to provide sufficient evidence to support Osborne's conviction under 18 U.S.C. § 641.

## II.  THEFT, EMBEZZLEMENT, OR CONVERSION

### Preservation of the Issue

Although specificity is not required in a Rule 29 motion, "when a defendant makes a motion on specific grounds . . . all grounds not specified in the motion are waived." *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005) (citing *United States v. Dandy*, 998 F.2d 1344, 1357 (6th Cir. 1993)). "The specification of grounds in the motion is an indication that counsel has evaluated the record and has these particular reasons for his motion." *Dandy*, 998 F.2d at 1357 (citations omitted). Unlike in his appellate brief, Osborne's motion for

judgment of acquittal did not argue that the evidence failed to show that Andolsek "embezzled, stole, purloined, or converted" property of the government, and thus Osborne could not have aided and abetted him in that crime.  (R. 136 Mot. for J. of Acquittal, PageID # 922.)  Because Osborne made a motion for judgment of acquittal on specified grounds, and those grounds did not include the claim that is on appeal, Osborne cannot now raise this argument.

## CONCLUSION

For the foregoing reasons, we **REVERSE** Osborne's conviction and **VACATE** his sentence.